[No. 56249-1. En Banc. May 27, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. PAUL H. KALAKOSKY, *Appellant*.

*Paul J. Burns,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Clark D. Colwell, Chief Criminal Deputy,* for respondent.

ANDERSEN, C.J. —
### FACTS OF CASE

A jury found the defendant Paul H. Kalakosky guilty of four rapes and one attempted rape. Kalakosky appeals these convictions claiming: (1) a search warrant for his residence, trailer and vehicles was not supported by probable cause; (2) the taking of blood samples with a warrant, but without notice and an adversarial hearing, violated his Fourth, Fifth and Sixth Amendment rights; (3) the five counts should have been severed and tried separately; (4) the trial court erred in admitting DNA (deoxyribonucleic acid) evidence which linked him to one of the rapes; and (5) the trial court erred in refusing to conduct an in camera inspection of a rape crisis center counselor's notes.

During an approximate 6-week period of time, four rapes and an attempted rape occurred in Spokane. On November 7, 1987, 13-year-old S.H. was kidnapped by a masked male and taken to a small trailer where he raped her. Sixteen-year-old K.W. was kidnapped and raped on November 29, 1987. On December 5, 1987, 20-year-old C.F. was raped in her home. Twenty-six-year-old L.S. was kidnapped, taken to an abandoned house and raped on December 12, 1987. On December 21, 1987, 17-year-old K.L. was kidnapped and a rape was attempted in an alley. None of the victims were able to identify the masked assailant.

On December 22, 1987, the police obtained a search warrant for defendant's home, trailer and vehicles. After evidence was found tying the defendant to several of the rapes, defendant was arrested and detained on a parole hold. Three warrants were obtained to compel the defendant to supply blood samples for various forensic testing. Initial testing of the semen found in some of the victims showed the rapist was a type A secretor. The test of the defendant's blood showed him to be a type A secretor. A second warrant was

issued to obtain a sample of defendant's blood to send to Lifecodes Laboratory for DNA testing. A third warrant was obtained because the earlier sample had clotted, making DNA testing more difficult.

After receiving the DNA testing results, the prosecuting attorney apparently decided not to charge the defendant with the rape of a sixth rape victim as the DNA test was exculpatory. However, the DNA testing linked defendant to the rape of C.F. and criminal charges on the five crimes were filed. Defense counsel moved to sever the counts, suppress the evidence seized in his home, trailer and vehicles and exclude DNA evidence. The trial court held a lengthy *Frye*[1] hearing regarding the general acceptance of DNA theory and the restriction fragment length polymorphism (RFLP) laboratory test in the relevant scientific community, and the reliability of the particular test conducted in this case.

The trial court denied all motions to suppress and declined to sever the counts.

Defense counsel also asked the trial court to conduct an in camera inspection of the notes of a rape crisis center counselor who had counseled one of the rape victims. The trial court declined to engage in such an inspection.

At a jury trial, the defendant was found guilty on all five counts.

This court accepted direct review.

Five basic issues are presented.

## ISSUES

ISSUE ONE. Was the search warrant for defendant's home and vehicles supported by probable cause?

ISSUE TWO. Is notice to defense counsel and an adversarial hearing constitutionally required before a search warrant may authorize the taking of a sample of blood from one arrested but not yet charged?

ISSUE THREE. Did the trial court err in denying the defendant's motion to sever the counts for trial?

---

[1]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

ISSUE FOUR. Did the trial court err in admitting expert testimony regarding DNA evidence?

ISSUE FIVE. Did the trial court violate the defendant's statutory or constitutional rights by refusing to review the rape crisis center's notes involving counseling of one of the rape victims?

DECISION

ISSUE ONE.

CONCLUSION. The search warrant for defendant's home and vehicles was supported by probable cause; the trial court did not err in denying the motion to suppress evidence.

Probable cause is established in an affidavit supporting a search warrant by setting forth facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity.[2] An affidavit need not establish proof of criminal activity, but merely probable cause to believe it may have occurred.[3] The affidavit is evaluated in a commonsense manner with doubts resolved in favor of validity, and with considerable deference being accorded to the issuing judge's determination.[4]

In the present case, the affidavit described five rapes or attempted rapes in which the perpetrator used very similar methods of operation. The defendant's physical description was consistent with the descriptions of the rapist provided by the victims.

The affidavit explained that a police officer had observed Kalakosky in a vehicle which matched the description of one of the vehicles described by one of the rape victims. Some of the victims had told police they were assaulted on a sleeping bag and the officer saw sleeping bags on the floor of Kala-

---

[2]*State v. Perrone*, 119 Wn.2d 538, 551, 834 P.2d 611 (1992); *State v. Maxwell*, 114 Wn.2d 761, 791 P.2d 223 (1990).

[3]*State v. Gunwall*, 106 Wn.2d 54, 73, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

[4]*State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977); *State v. Mak*, 105 Wn.2d 692, 714, 718 P.2d 407, *cert. denied*, 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986); *Maxwell*, 114 Wn.2d at 770; *State v. Freeman*, 47 Wn. App. 870, 873, 737 P.2d 704, *review denied*, 108 Wn.2d 1032 (1987).

kosky's vehicle. When the officer questioned Kalakosky, he said he was having car trouble and had walked to his sister's home. However, the officer noted the vehicle started without trouble and the police later learned the suspect did not have a sister.

On a different day, during a "decoy surveillance deployment", the rape task force members noticed Kalakosky slowly cruising the neighborhood of the rapes for approximately 1 hour without any apparent destination. During that time he was observed by members of the surveillance team to be driving very slowly and watching young children. The rape victims were either quite young or very slight and young looking.

The affidavit stated that Kalakosky had a lengthy criminal record. Police knew from files available in the prosecutor's office that he had type A blood and evidence from the rapes showed the rapist was type A.

Immediately after a rape attempt, police observed Kalakosky dressed in dark clothing hurrying into his home. The police also observed a trailer parked outside his home which matched the description given by one of the first rape victims. Also located at his residence were vehicles which generally had been described by various rape victims.

During a motion to suppress, the trial court excluded consideration of one piece of information regarding an anonymous informant's statement that the suspect liked to wear western clothing. The court then concluded that, even disregarding the statement regarding criminal history, the warrant was supported by probable cause.

We agree there was ample information in the affidavit from which the judge could reasonably conclude that Kalakosky probably was involved in criminal activity. We therefore uphold the trial court's denial of the motion to suppress.

ISSUE TWO.

CONCLUSION. A valid search warrant based upon probable cause is constitutionally sufficient to obtain a blood sample from a suspect; no adversarial hearing is necessary prior to the issuance of such a warrant.

After the defendant was arrested, he was detained on a parole hold, and the Spokane County Public Defender's office was appointed as counsel at his initial court appearance the following day. Three different warrants were obtained authorizing the taking of blood samples from defendant. The first warrant clearly established probable cause to justify taking a blood sample from the defendant. The second warrant stated that an additional blood sample was necessary because new physical evidence had been obtained during the rape investigation, *i.e.*, blood on a sleeping bag found in the defendant's vehicle. The third blood sample was required because the first one sent to Lifecodes Laboratory had coagulated and might be difficult to test for DNA identification. All three search warrants were obtained after arrest, but prior to charging.

There is no allegation that these warrants lacked probable cause. Rather, defendant argues he was entitled to a hearing and to notice to his counsel and that a search warrant obtained ex parte is not constitutionally sufficient. He argues that the State should have proceeded under CrR 4.7(b)(2)(vi) which provides that the court, on motion, may require the defendant to permit the taking of blood samples.

The prosecuting attorney argues that the criminal discovery rule, CrR 4.7, does not preempt CrR 2.3 allowing issuance of search warrants based upon probable cause and that an application for a search warrant does not become an adversarial proceeding simply because the subject has been arrested. The trial court reasoned that the criminal discovery rule may be utilized after a proceeding has been initiated; in the investigative stage (while defendant was on a parole hold and not yet charged) a search warrant supported by probable cause was an appropriate vehicle to obtain a blood test. We agree.

In *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966), the Court held that a suspect's blood can be taken *even without a warrant* if exigent circumstances exist. The Court in *Schmerber* explained that: the taking of blood is commonplace, the quantity taken is mini-

mal and the procedure involves virtually no risk, trauma or pain; the privilege against incrimination is not violated as the evidence is not testimonial or communicative in nature; and there was no violation of the Sixth Amendment right to counsel caused by taking a blood sample in that case.

Since blood tests are not testimonial, defendant's Fifth Amendment argument is without merit.[5] In regard to defendant's right to counsel argument, it is firmly established that the right to counsel under the Sixth Amendment and under Const. art. 1, § 22 (amend. 10) attaches only at or after initiation of formal charges.[6] Additionally, the taking of nontestimonial physical evidence is not usually a critical stage at which the right to counsel attaches.[7] Therefore, defendant's Sixth Amendment argument is also without merit.

The question remains whether a warrant is sufficient to allow the taking of the arrestee's blood under the Fourth Amendment. The taking of blood samples is a search for Fourth Amendment purposes.[8] Generally, neither the Fourth Amendment nor the state constitution requires that the application for a search warrant be converted into an adversarial proceeding or one held upon notice; rather, it is an ex parte proceeding.[9] The narrower question is whether there is something about the taking of a suspect's blood which requires more than a magistrate's independent determination of probable cause. We conclude there is not.

---

[5]*Schmerber v. California*, 384 U.S. 757, 761, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *State v. Curran*, 116 Wn.2d 174, 186-87, 804 P.2d 558 (1991).

[6]*State v. Schulze*, 116 Wn.2d 154, 161, 804 P.2d 566 (1991); *State v. Judge*, 100 Wn.2d 706, 714, 675 P.2d 219 (1984).

[7]*United States v. Wade*, 388 U.S. 218, 227-28, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967) (taking of blood is not a critical stage at which right to counsel applies); *see also Schmerber*, 384 U.S. at 765-66 (because suspect had no right not to submit to blood tests regardless of his attorney's advice, he was not denied right to counsel).

[8]*Schmerber v. California, supra; Judge*, 100 Wn.2d at 711.

[9]*State v. Patterson*, 83 Wn.2d 49, 53, 515 P.2d 496 (1973).

Defendant relies on *In re Morgenthau*, 188 N.J. Super. 303, 457 A.2d 472, *cert. denied*, 93 N.J. 315, 460 A.2d 706 (1983), wherein the court *upheld* a trial court *order* compelling suspects to submit blood samples. The court held only that the trial court order permitting the minimal invasion was the "functional equivalent" of a search warrant. The court went on to note that the procedural difference between the two is that physical exemplars are "usually" granted after notice and hearing whereas ex parte application is usual with search warrants. *Morgenthau* does not support defendant's position as it does *not* hold that hearing or notice is required prior to a warrant being issued to obtain a blood sample. In *Winston v. Lee*, 470 U.S. 753, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985), the Court found the State's showing was inadequate to allow removal of a bullet from a suspect's chest because the procedure involved medical risks and the prosecution already had other evidence. *Winston* distinguished such major surgery from such minor intrusions as the taking of blood samples. *Winston* expressly left open the question whether an adversarial hearing, which it characterized as "special procedural protection", is required before authorization of such an invasive procedure as surgery.[10] In light of this rationale, it is highly unlikely the Court would require an adversarial proceeding for such a minor intrusion as a blood test. The Court's discussion of blood tests in *Schmerber* supports this conclusion.

Washington case law has focused on the existence of probable cause when considering the propriety of warrants authorizing the taking of blood samples.[11] Several other jurisdictions have rejected the argument that notice to defense coun-

---

[10]*Winston v. Lee*, 470 U.S. 753, 763 n.6, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985).

[11]*See, e.g., State v. Bockman*, 37 Wn. App. 474, 487, 682 P.2d 925, *review denied*, 102 Wn.2d 1002 (1984); *State v. Osborne*, 18 Wn. App. 318, 321, 569 P.2d 1176 (1977), *review denied*, 89 Wn.2d 1016 (1978). *See also State v. Curran*, 116 Wn.2d 174, 804 P.2d 558 (1991) (rejecting defendant's argument his Const. art. 1, § 7 rights were violated when his blood was taken over his objection).

sel is necessary prior to issuance of a warrant to obtain a blood sample from a defendant.[12]

Given the normal ex parte nature of search warrant applications, the authority supporting the conclusion that probable cause is a proper criterion for judicial authorization of a blood sample, and the fact that the Supreme Court has found blood tests to be a very minimal intrusion, we conclude that neither notice nor an adversarial hearing is constitutionally mandated prior to the issuance of a search warrant to obtain a blood sample from a suspect. Since probable cause is the proper determination for such a search, little is to be availed by allowing a contested hearing. In any event, if the magistrate's determination of probable cause is not subsequently upheld, the evidence will be suppressed.[13]

We therefore hold that the trial court was correct in denying the motion to suppress evidence derived from testing blood samples taken from the defendant.

ISSUE THREE.

CONCLUSION. A motion to sever counts is addressed to the sound discretion of the trial court. The court here did not abuse its discretion in denying the motion to sever the five counts.

■ ■ Defendant argues he should have been afforded separate trials on each of the five counts charged. We dis-

---

[12]*Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (in spite of a criminal procedural rule requiring notice to defense counsel, the failure to give notice to defense counsel before taking a blood sample from an arrested defendant did not prejudice defendant and suppression of the evidence was not required), *cert. denied*, ___ U.S. ___, 119 L. Ed. 2d 571, 112 S. Ct. 2948 (1992); *State v. Kennison*, 149 Vt. 643, 546 A.2d 190 (1987) (the ex parte granting of an order for the taking of a blood sample does not violate defendant's right to counsel) (citing *United States v. Wade*, 388 U.S. 218, 227-28, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967)), *cert. denied*, 486 U.S. 1011, 100 L. Ed. 2d 206, 108 S. Ct. 1743 (1988); *People v. Pugh*, 49 Ill. App. 3d 174, 363 N.E.2d 1212 (1977) (trial court did not err when it denied defendant's motion to suppress blood samples taken from him without any notice to defense counsel); *State v. Jones*, 279 Or. 55, 566 P.2d 867 (1977) (any error in obtaining an ex parte warrant for a blood test did not involve the defendant's constitutional rights).

[13]*See Patterson*, 83 Wn.2d at 53.

agree. This court recently clarified the principles governing severance of similar counts in *State v. Bythrow*, 114 Wn.2d 713, 717-18, 790 P.2d 154 (1990):

> CrR 4.3(a) permits two or more offenses of similar character to be joined in one trial. Offenses properly joined under CrR 4.3(a), however, may be severed if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). The failure of the trial court to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion. Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.

(Footnotes and citations omitted.)

In *Bythrow*, we considered the jury's ability to compartmentalize the evidence, the strength of the State's evidence on each count, the issue of cross admissibility of the various counts, whether the judge instructed the jury to decide each count separately, and we strongly weighed the concern for judicial economy.

In the present case, it was not a particularly complicated task to keep the testimony and evidence of the five crimes separate. Each victim described quite a different episode even though there was much in the rapist's methods that was the same.

In the first rape, a man wearing a dark ski mask kidnapped a 13-year-old girl from a birthday party on a Saturday night, covered her eyes with tape and cloth, and attempted to tape her mouth, tied her hands behind her and took her to a trailer where he put her on a sleeping bag and repeatedly raped her. He abducted her at knifepoint and clicked a gun while he raped her.

In the second rape, a man with a dark ski mask kidnapped a 16-year-old girl at gunpoint from her neighborhood late on a Saturday night, blindfolded her with a bandanna, put duct tape on her mouth, tied her hands and raped her on a sleeping bag inside a station wagon.

In the third rape, a man with a dark ski mask broke into the victim's home late on a Friday night, and raped her while he clicked a gun. He also threatened to shoot her baby.

In the fourth rape, a man with a dark ski mask kidnapped a young woman from a school field late on a Friday night, blindfolded her, tied her hands with a bandanna, took her to an abandoned house where he put her on a sleeping bag and raped her after hitting her on the head with a gun.

During the fifth crime, a man with a dark ski mask kidnapped a 17-year-old girl late at night at gunpoint, blindfolded her with a bandanna, and clicked a gun before attempting to rape her in an alley.

With regard to cross admissibility, evidence of another crime is not admissible to prove identity under ER 404(b) unless the method of both is so unique that the proof that an accused committed one of them creates a high probability that he committed the other.[14] Whether or not the method of committing the five crimes in this case was sufficient to constitute such a "modus operandi" as to make the crimes cross admissible, severance is not necessarily mandated even if they were not so related. The fact that separate counts would not be cross admissible in separate proceedings does not necessarily represent a sufficient ground to sever as a matter of law.[15]

The State's evidence was strong on each count. For example, in the first rape, a sleeve of a western-style shirt was found tied around the victim's neck when she was found and the rest of the shirt was found in defendant's trailer. In the second rape, the victim identified a vehicle in defendant's possession that had a metal piece in the back as similar to the one she was tied to when she was raped. Additionally, the victim's mouth was covered with duct tape and duct tape, which had been cut in strips and rolled around a piece of wood, was found in the defendant's house. In the third rape, the DNA from the defendant's blood matched DNA in semen found in the victim's house at the rape scene. In the fourth case, the victim said she was kidnapped in a white

---

[14]*State v. Bythrow*, 114 Wn.2d 713, 720, 790 P.2d 154 (1990).

[15]*Bythrow*, 114 Wn.2d at 720; *State v. Markle*, 118 Wn.2d 424, 439, 823 P.2d 1101 (1992).

pickup and had her hands and eyes tied with a bandanna. Defendant owned a white pickup and testimony from his neighbors indicated he often wore bandannas on his head. Blood found on defendant's sleeping bag matched the blood type of the injured victim. In the fifth crime, defendant was seen hurrying into his house shortly after the rape attempt dressed similarly to the suspect. A bandanna was jerked off the blond victim's head when he left her and a bandanna with blond hairs compatible with those of the victim was found in his vehicle.

The trial judge gave instructions which told jurors they must decide each count separately as if it were a separate trial, and that they could consider evidence of other counts for the limited purpose of determining whether they showed a common scheme or plan or method of operation, if any.

"Defendants seeking severance must not only establish that prejudicial effects of joinder have been produced, but they must also demonstrate that a joint trial would be so prejudicial as to outweigh concern for judicial economy."[16] Given that the crimes were not particularly difficult to "compartmentalize", that the State's evidence on each count was strong, and that the trial court instructed the jury to consider the crimes separately, we conclude that the trial court was well within its broad discretion in finding that the potential prejudice did not outweigh the concern for judicial economy.

ISSUE FOUR.

CONCLUSION. The trial court did not abuse its discretion in admitting DNA evidence as the challenge to the reliability of this particular test went to the weight of the evidence and not to its admissibility.

The defendant assigns error to the trial court's ruling admitting DNA[17] evidence linking him to the rape of C.F.

---

[16]*Bythrow*, 114 Wn.2d at 722.

[17]For a complete discussion regarding the admissibility of forensic DNA evidence in criminal proceedings, see our recent decision in *State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993).

Defendant does not raise issues regarding the general acceptance of forensic DNA evidence, the RFLP test or the statistical components of that test.[18] Rather, defendant argues that the specific laboratory procedures utilized in this case to analyze the DNA samples were so flawed by human error as to make the results inadmissible as a matter of law.

We recently addressed this issue at length in *State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993), wherein we concluded that both the general scientific theory underlying the forensic use of DNA identification evidence and the RFLP test were generally accepted in the relevant scientific communities, and hence pass the *Frye*[19] test. We explained that once a *Frye* determination is made, a defendant's objection to the particular testing procedures utilized in a given case should be analyzed under the usual standards for admission of evidence. *Cauthron*, 120 Wn.2d at 889-90 (citing ER 702).

The admissibility of expert testimony is governed by evidence rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowl-

---

[18]The defense brief includes a footnote which "refers" this court to trial memorandum. To the extent it is alerting this court to the fact that the spillage and mislabeling errors were issues raised to the trial court, it is appropriate in an appellate brief. However, such a statement does not expand the scope of appellate review. Only issues raised in the assignments of error or related issues and argued to the appellate court are considered on appeal. RAP 10.3; RAP 12.1; RAP 13.7. *See, e.g., State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991); *State v. Fortun*, 94 Wn.2d 754, 756, 626 P.2d 504 (1980); *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 46, 785 P.2d 815 (1990); *Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.*, 96 Wn.2d 806, 815, 638 P.2d 1220 (1982); *State v. Cunningham*, 93 Wn.2d 823, 836, 613 P.2d 1139 (1980).

If this court allowed parties to expand the issues subject to appeal by reference to trial memoranda, the Rules of Appellate Procedure would be rendered meaningless. Respondents would have no idea what issues require a response, and appellate courts would have to search trial court records and clerk's papers and address all issues raised below. Such an "end run" around the Rules of Appellate Procedure will not be sanctioned; the primary purpose of the rules is to afford fairness and notice of the scope of review to the court and all litigants.

[19]*Frye v. United States*, 293 F. 1023, 34 A.L.R. 145 (D.C. Cir. 1923).

edge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As we explained in *Cauthron*, the 2-part test to be applied under ER 702 is whether (1) the witness qualifies as an expert and (2) the expert testimony would be helpful to the trier of fact. Part 1 is not the focus of this appeal; there is no challenge to the qualifications of the expert witnesses. Part 2 is to be applied by the trial court to determine if the particular DNA test in a given case is so flawed as to warrant exclusion. If the testimony before the trial court shows that a given testing procedure was so flawed as to be unreliable then the results might be excluded because they are not "helpful to the trier of fact". The issue of human error in the forensic laboratory is analyzed under ER 702 and is not a part of the *Frye* test which asks if the theory underlying the science and the RFLP test are generally accepted in the relevant scientific community. The *Frye* inquiry is the threshold issue and is subject to de novo review while the ER 702 inquiry follows after the *Frye* conclusion and is subject to a different standard of review whereby the appellate court accords deference to the discretion of the trial court.

When the challenge to admissibility is to the errors in a given test, the determination of whether expert testimony is admissible is within the discretion of the trial court; unless there has been an abuse of discretion, this court will not disturb the trial court's decision.[20] Although the possibility of human error in the forensic laboratory will continue to be a relevant inquiry, the trial court is best suited to address these factual matters.[21] As we explained in *Cauthron*, once DNA evidence is determined to be generally admissible, then both proponents and opponents of a *particular* test should be able to garner the necessary information to present both sides of the issue to the factfinder when there is a challenge to the validity of a given laboratory procedure.

---

[20]*Cauthron*, 120 Wn.2d at 890; *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046, 112 L. Ed. 2d 772, 111 S. Ct. 752 (1991).

[21]*Cauthron*, 120 Wn.2d at 890.

This is what occurred in this case. In the present case the following scientists testified for the State: Michael Baird, Ph.D., a geneticist and Director of Forensic and Paternity Testing for Lifecodes Corporation; Stanley Gartler, Ph.D., a Professor of Genetics, University of Washington; and Lisa Bennett, a DNA forensic scientist who tested the samples in this case. Testifying for the defense were: Randall Libby, Ph.D., a research associate from the Department of Genetics at the University of Washington, and Seymour Geisser, Ph.D., Director of the School of Statistics, University of Minnesota. The jury heard state and defense experts debate the reliability of the DNA testing and the relevance of any irregularities in the testing procedures.

The challenge made here on appeal concerns two human errors which occurred in the laboratory and whether they affected this particular test's reliability. The defense mischaracterizes the two errors which occurred during the testing. The defense asserts that semen samples taken from the C.F. crime scene were spilled in "close working proximity to samples of defendant's blood". The record does not support this. The laboratory scientist who conducted the test testified that although a small portion of the semen sample from the crime scene was spilled out of a test tube, the defendant's blood sample was nowhere near the spillage and was not even associated with the procedure concerning the semen sample. The laboratory supervisor also testified there was no way this spill affected the reliability of the testing as the evidentiary samples were tested on different days. The trial court concluded that there was no evidence that the spill resulted in any contamination or otherwise impugned the reliability of the test. We conclude that there was substantial evidence to support the conclusion that this mishap did not affect the reliability of the testing.

The defense also alleges that there was evidence of a mislabeled autoradiograph which compromised the reliability of the DNA testing. This also is unsupported by the record. One autoradiograph which was a copy of the permanent nylon membrane was initially mislabeled with a wrong

number, but the mistake was detected and remedied. A number of copies of the same autoradiograph were run of the particular test and the mislabeled copy was not one offered into evidence.

 Whether the spill or the initially mislabeled autoradiograph affected the reliability of the test is a question of fact. Alleged infirmities in the performance of a test usually go to the weight of the evidence, not to its admissibility.[22] One commentator has pointed out that courts should not automatically exclude scientific evidence whenever the forensic analyst deviates from correct test protocol in any minor respect; rather the deviation would have to materially affect the test outcome to warrant exclusion.[23] While there might be situations where irregularities in a laboratory testing procedure could be the basis for excluding the test results from evidence, the irregularities which occurred here do not warrant such exclusion.

We reiterate that forensic DNA identification theory, and the RFLP test in particular, are generally accepted in the relevant scientific communities of molecular biology and population genetics and therefore pass the *Frye* test.[24] We conclude that the irregularities in the testing procedure pointed out by the defense in this case are issues which were properly argued to the factfinder and not such errors as to mandate exclusion of the test results.

ISSUE FIVE.

CONCLUSION. The Federal Victims of Crime Act of 1984 does not preempt Washington state law on the discovery of the records of rape crisis centers in criminal proceedings. However, the trial court's refusal to engage in an in camera review

---

[22]*Cauthron*, 120 Wn.2d at 889-90; *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992); *Commonwealth v. Phoenix*, 409 Mass. 408, 421-22, 567 N.E.2d 193, 201 (1991).

[23]Imwinkelried, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash. U.L.Q. 19, 46 (1991).

[24]*State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993).

of the rape crisis center's records is sustainable because the defendant made no threshold showing of materiality.

Before trial, defense counsel made a motion for in an camera review, and discovery of, a rape crisis center counselor's notes regarding one of the rape victims. The motion stated only that the "notes may contain details which may exculpate the accused or otherwise be helpful to the defense."

An attorney for the rape crisis center responded to this discovery motion and argued that federal law preempted the applicable state statute on this discovery issue. The prosecution deferred to the rape crisis center on the issue of federal preemption, but alternatively argued that the defendant had failed to make the requisite threshold showing to justify an in camera review under the state statute, RCW 70.125.065.

The trial court denied the motion for an in camera inspection finding that federal law preempted state law, and that the defense had made no threshold showing that the information may be exculpatory.

We first ask whether the federal law,[25] preempts the Washington state statute[26] regarding the admissibility of rape crisis center counseling notes in a criminal trial.

Since we conclude that federal law does not preempt state law, we then ask whether the trial court's refusal to conduct an in camera review of the rape victim's records violates the state statute, RCW 70.125.065, or the defendant's constitutional rights.

In Washington, the records of rape crisis centers are not available for discovery in a sexual assault case unless certain conditions are met. RCW 70.125.065 provides:

> Records maintained by rape crisis centers shall not be made available to any defense attorney as part of discovery in a sexual assault case unless:
> (1) A written pretrial motion is made by the defendant to the court stating that the defendant is requesting discovery of the rape crisis center's records;

---

[25]Victims of Crime Act of 1984, 42 U.S.C. § 10604.

[26]Victims of Sexual Assault Act, RCW 70.125.

*(2) The written motion is accompanied by an affidavit or affidavits setting forth specifically the reasons why the defendant is requesting discovery of the rape crisis center's records;*

(3) The court reviews the rape crisis center's records in camera to determine whether the rape crisis center's records are relevant and whether the probative value of the records is outweighed by the victim's privacy interest in the confidentiality of such records taking into account the further trauma that may be inflicted upon the victim by the disclosure of the records to the defendant; and

(4) The court enters an order stating whether the records or any part of the records are discoverable and setting forth the basis for the court's findings.

(Italics ours.)

The rape crisis center appeared through its attorney and argued that 42 U.S.C. § 10604(d) establishes an absolute privilege for such notes. 42 U.S.C. § 10604(d) provides:

**Revealing research or statistical information; prohibition; immunity from legal proceedings; permission; admission of information as evidence**

Except as otherwise provided by Federal law, no officer or employee of the Federal Government, and no recipient of sums under this chapter, shall use or reveal any *research or statistical information* furnished under this chapter by any person and identifiable to any specific private person for any purpose other than the purpose for which such information was obtained in accordance with this chapter. *Such information,* and any copy of such information, shall be immune from legal process and shall not, without the consent of the person furnishing such information, be admitted as evidence or used for any purpose in any action, suit, or other judicial, legislative, or administrative proceeding.

(Italics ours.) This section of the statute is one of the administrative provisions of the Victims of Crime Act of 1984. 42 U.S.C. § 10601 *et seq.*

Although the discovery and admissibility of rape crisis center notes is a much debated issue in recent case law nationwide, no decision has been located which even mentions federal preemption of this criminal discovery issue. No authority has been cited to this court wherein any court has held that the Federal Victims of Crime Act of 1984 preempts state law on criminal discovery issues. The confidentiality section of that federal act concerns the "research or statisti-

cal information furnished under this chapter." It is not at all clear that this would include a rape crisis center's counseling notes regarding a rape victim. In fact, in the Code of Federal Regulations pertaining to the Victims of Crime Act of 1984 "research or statistical information" is defined as "any information which is collected during the conduct of a research or statistical project and which is intended to be utilized for research or statistical purposes." 28 C.F.R. § 22.2(d). The regulations further state that *"research or statistical information"* identifiable to an individual is immune from judicial proceedings. 28 C.F.R. § 22.28.

A reviewing court should not infer a congressional purpose to preempt state law.[27] We have recently reiterated that there is a strong presumption against finding congressional intent to preempt[28] and a finding that Congress intended to preempt state law in a given field must be based on an unambiguous congressional mandate to that effect.[29] The party claiming federal law has preempted state law has the burden of overcoming the presumption against preemption.[30]

Whether counseling notes of rape victims fall into the category of "research or statistical information" referred to in the federal statute is doubtful. Therefore, given the strong presumption against federal preemption unless such an intent is clear, we decline to conclude that the Federal Victims of Crime Act of 1984 preempts state statutory law regarding discovery in criminal trials.

Since we conclude that federal law (which arguably may provide an absolute privilege against discovery for the records to which it applies) does not preempt the Washington discovery statute, we need not address the issue of whether an

---

[27]*State v. Williams*, 94 Wn.2d 531, 538, 617 P.2d 1012, 24 A.L.R.4th 1191 (1980).

[28]*Inlandboatmen's Union v. Department of Transp.*, 119 Wn.2d 697, 702, 836 P.2d 823 (1992); *Housing Auth. v. Terry*, 114 Wn.2d 558, 565, 789 P.2d 745 (1990).

[29]*Pioneer First Fed. Sav. & Loan Ass'n v. Pioneer Nat'l Bank*, 98 Wn.2d 853, 858, 659 P.2d 481 (1983).

[30]*Inlandboatmen's*, 119 Wn.2d at 702.

*absolute* privilege for rape counseling notes would violate the defendant's constitutional rights. Our state statute provides a qualified, rather than an absolute, privilege against discovery of rape crisis center counseling notes and hence the issue of the constitutionality of an absolute ban on discovery is not before us. We recognize the Supreme Court[31] has declined thus far to reach this issue and that there is a split of authority in other jurisdictions.[32]

The narrower issue raised in this case, however, is whether the trial court erred in refusing to conduct an in camera review. The trial judge's alternative holding to support denial of the discovery motion was that the defense had not made a "threshold showing that the information may be exculpatory". We agree that before a rape victim's privacy interests are infringed, our statute requires a defendant to make a showing of need for a review of counseling records.

The Victims of Sexual Assault Act, RCW 70.125, seeks to protect rape victims' expectations of privacy in their communications with sexual assault counselors. We recognize that a key element in the successful counseling of sexual assault victims is the assurance of confidentiality of their communications.[33] We are also mindful of the fact that old common law rules caused victims to be victimized a second time in the course of confronting the accused.[34] Of recent years, legislatures and courts have attempted to provide rape victims some privacy rights so that they could have realistic

---

[31]*Pennsylvania v. Ritchie*, 480 U.S. 39, 57 n.14, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987).

[32]*Compare Advisory Opinion to the House of Representatives*, 469 A.2d 1161, 43 A.L.R.4th 385 (R.I. 1983) *with People v. Foggy*, 121 Ill. 2d 337, 521 N.E.2d 86, *cert. denied,* 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044 (1988).

[33]*See* Note, *The Existing Confidentiality Privileges as Applied to Rape Victims,* 5 J.L. & Health 101 (1990-91).

[34]*State v. Gonzalez*, 110 Wn.2d 738, 757 P.2d 925 (1988); Annot., *Constitutionality, With Respect to Accused's Rights to Information or Confrontation, of Statute According Confidentiality to Sex Crime Victim's Communications to Sexual Counselor,* 43 A.L.R.4th 395 (1986); Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom,* 77 Colum. L. Rev. 1 (1977).

access to medical care, emergency counseling, and the psychological support necessary to report crime and aid police to prevent future crime.[35] At issue in this case is whether Washington's legislatively created privilege will be overcome simply by a demand from the accused without any showing at all of need or materiality of the private information sought. The qualified privilege afforded in the Victims of Sexual Assault Act[36] reflects a careful effort to balance the accused's constitutional rights against the rights of the victim to seek counseling at a rape crisis center to aid in dealing with the trauma of rape and the right to expect such counseling will not be made public. The statute clearly requires that the defendant make some statement showing need for the counseling notes before the victim's right to privacy is overcome.

In this case, the defendant's failure to make such a threshold showing supports the trial court's decision not to conduct an in camera review. RCW 70.125.065 provides that rape crisis center records are not available to defense counsel unless (1) a pretrial motion is made; (2) "[t]he written motion is accompanied by an affidavit or affidavits *setting forth specifically the reasons* why the defendant is requesting discovery of the rape crisis center's records" (italics ours); (3) the court reviews the records in camera; and (4) the court orders discovery.

In this case the affidavit accompanying the motion merely states that the police reports indicate the victim spoke to a rape crisis worker shortly after the rape about details of what happened and that the defense attorney believes such "notes may contain details which may exculpate the accused or otherwise be helpful to the defense". If we concluded that such a statement was sufficient to constitute a threshold showing, then such records would always be susceptible to in camera review. We do not perceive this to have been the intent of the Legislature when it passed the Victims of Sexual Assault Act.

---

[35]*People v. Foggy*, 121 Ill. 2d at 338-39; RCW 70.125.020.

[36]RCW 70.125.

We decline to ignore the statute's requirement for "reasons" why a defendant is seeking in camera review of the rape crisis center's records. The statute requires *both* a motion and supporting affidavits giving specific reasons why the presumptively privileged records should be revealed. We therefore conclude that the trial court did not abuse its discretion in declining to engage in an in camera review as the statutory requirements were not fulfilled.

We find no constitutional impediment to this requirement that the defendant make some showing of need before these presumptively privileged records are inspected.[37] A number of cases in other jurisdictions have considered this issue. In *People v. Foggy*, 121 Ill. 2d 337, 347, 521 N.E.2d 86, *cert. denied*, 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044 (1988), the Supreme Court of Illinois held that an in camera inspection of rape crisis notes by the trial court is *not* constitutionally required if a defendant's request is merely general and not supported by any allegations that information useful to the defense was likely to be found in the files.

In *People v. District Court*, 719 P.2d 722, 726 (Colo. 1986), the Colorado Supreme Court found a trial court had erred in granting an in camera inspection of an assault victim's counseling records because the defendant had failed to make any particularized factual showing in support of his assertion that access to privileged communication of the victim was necessary for effective exercise of his right of confrontation. The court held that vague assertions that the victim may have made statements to her therapist that possibly differ from the victim's trial testimony do *not* provide a sufficient basis to justify ignoring the victim's right to rely on her statutory privilege.

---

[37]*See United States v. Agurs*, 427 U.S. 97, 109-10, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *Ritchie*, 480 U.S. at 59 n.15; *State v. Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (the mere possibility that an item of undisclosed information might have helped the defense does not establish materiality in a constitutional sense), *cert. denied*, 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986); *Gonzalez*, 110 Wn.2d at 750-51 (a defendant's discovery rights available under the federal and state constitutions require some showing the information sought is material to the defense).

The court in *Commonwealth v. Kyle*, 367 Pa. Super. 484, 501, 533 A.2d 120, 129 (1987) (citing *State v. Whitaker*, 202 Conn. 259, 271-72, 520 A.2d 1018, 1025 (1987)), *appeal denied*, 541 A.2d 744 (1988), states that a claim of privilege may be countered by a showing that there are reasonable grounds to believe that the failure to produce the information is likely to impair the defendant's right of confrontation.

In *State v. Vincent*, 156 Vt. 259, 591 A.2d 65 (1991), the Vermont Supreme Court held the trial court was correct in refusing to compel discovery of a rape crisis counselor's identity in light of the fact that the defendant had failed to make a showing there was a specific reason why this information should be revealed.

We conclude that before a rape victim's privacy should be invaded by a review of crisis center counseling notes that the defendant must make a particularized showing that such records are likely to contain material relevant to the defense. In the present case the defendant made no showing of specific reasons why he needed this information. In fact, the trial court queried whether the request was simply a fishing expedition. In view of these facts, it is difficult to perceive that the records could contain exculpatory material. None of the rape victims ever saw their attacker so there was no eyewitness testimony to be impeached. There is no allegation of consent to intercourse or even any prior acquaintance between the victim and the defendant. On these facts no showing of a need for these presumptively privileged notes was made.

In sum, we hold that the federal law does not preempt our state statute so as to provide an absolute ban on discovery of rape crisis center records, but we sustain the trial court's denial of defendant's motion for in camera review based upon the defendant's failure to make the requisite threshold showing of need to discover the privileged records. In order to make an adequate threshold showing to justify an in camera inspection, a defendant must make a particularized factual showing that information useful to the defense is likely to be found in the records. Such determinations must necessarily be left initially to the trial court's discretion as they will usually be factually specific inquiries.

We affirm the convictions.

BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

UTTER, J. (concurring) — I write to reiterate the concerns articulated in Justice Dore's dissent in *State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993). Namely, until such time as a technique for computing the statistical probabilities is accurate enough to be accepted by a consensus in the relevant scientific community, DNA evidence should not be admitted to inculpate defendants.[38] At the very least, only the statistical evidence upon which a consensus of experts would agree, *i.e.*, only the most *conservative* of statistical probability estimates, should be presented to the jury. I concur in the disposition of this case only because the defendant did not raise issues regarding the general acceptance of DNA forensic evidence or the statistical component of DNA testing. See majority, at 539-40. The latter is the issue on which Justice Dore based his dissent in *Cauthron*.

Reconsideration denied August 9, 1993.

---

[38]For a clear and concise description of the problems attending the determination of DNA "matches", see Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers*, 76 Judicature 222, 224 (1993). Reported matches may not be "true" matches because laboratories make mistakes, and because even if the defendant is the source of the trace, the defendant may innocently have left the trace before or after the crime was committed. More problematic still is the method used for estimating "random match probability", *i.e.*, the theoretical likelihood that a randomly selected person from the general population (or a large racial or ethnic group) would genetically match the trace evidence as well as the defendant:

An important criticism of DNA frequency statistics is that they fail to take into account the population of interest. The frequency statistics computed by most laboratories compare the defendant to a randomly selected person in some general population (e.g., North American caucasians). . . . [However] the general population may not be a fair genetic representation of the potential source population, the group of people who might reasonably be the source of the recovered trace evidence.

Koehler, at 227.