IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30977-1-III |
| Appellant, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON CHARLES YOUKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Okanogan County law enforcement officers executed a search warrant on defendant Jason Youker's residence. After the filing of criminal charges, Youker moved to suppress evidence gathered during the search, arguing the affidavit in support of the search warrant lacked information sufficient to establish probable cause. The trial court agreed, suppressed the evidence, and dismissed the case without prejudice. The State appeals, arguing the trial court applied the wrong standard of review when examining the earlier search warrant and asserting the affidavit averred facts sufficient to establish probable cause. We affirm the trial court's decision to suppress the evidence against Jason Youker because the search warrant affidavit lacked a sufficient nexus between Youker's residence and criminal activity. Allegations that Youker engaged in

criminal activity were conclusory and prevented the magistrate from performing its role as a neutral and independent evaluator of the evidence.

## FACTS

On March 28, 2012, police obtained from a magistrate and executed a search warrant at Jason Youker's residence, 1134 22nd Avenue, Oroville, Washington. The police seized marijuana, methamphetamine, heroin, scales, paraphernalia, and $9,000 in cash.

Starting in early 2011, anonymous sources and fellow law enforcement officers informed the North Central Washington Narcotics Task Force (Task Force) that a person nicknamed "Iceman" or "Ice Cream Man" sold heroin and methamphetamine in the Oroville area. Clerk's Papers (CP) at 19. These tips began a year-long investigation and ended with the application for a search warrant of Jason Youker's home. The Task Force provided the magistrate a 19-page affidavit, signed by Detective Steven D. Brown, sergeant and commander of the Task Force, to attain the warrant. The facts in this opinion arise principally from this affidavit. The affidavit seeks to connect Youker to people with a history of drug use or reputation for drug trafficking. The affidavit also seeks to identify Jason Youker as the Iceman and his home and truck as the tools for drug transactions.

On March 25, 2011, Task Force officers noticed Jason Hotchkiss parked next to Paulette Robertson's trailer in Oroville. The Task Force earlier purchased drugs from

Robertson, so officers followed Hotchkiss when he retrieved Robertson and drove her to Prince Hardware. Hotchkiss and Robertson sat in Hotchkiss' truck in the store parking lot, rather than enter the store. When their vehicle left the parking lot, police executed a traffic stop. A drug detecting dog smelled around and in the car. The dog alerted officers to the center console, but officers did not find any contraband in the location.

According to Oroville police officers and individuals claiming they purchased drugs from the Iceman, the Iceman did not like people coming to his house to purchase drugs. The Iceman asked buyers to park near Prince Hardware, located just east of Jason Youker's residence.

On March 30, police learned from a recording of a conversation between a confidential informant (CI) and Paulette Robertson that Robertson hid the drugs, during the traffic stop, inside her pants.

On April 19, a CI purchased methamphetamine from Paulette Robertson, at her trailer, in Oroville. Task Force officers observed a car arrive at the trailer and the officers assume one or both female occupants of the car delivered the methamphetamine for the purchase. Someone came from the trailer to greet the car occupants. The affidavit does not state that the officers saw any item passed between an occupant and the person from the trailer. After the purchase, the CI told the Task Force that he or she "could not be sure but believed" Robertson called a female named Cassie to deliver the drugs. CP at 20. The search warrant affidavit reads:

3

>It was later learned that Cassandra J. Vandeveer is the girlfriend of Jason Youker, who goes by the nick [sic] name ice man/ice cream man.

CP at 20. The affidavit does not disclose how officers learned that Vandeveer is the girl friend of Jason Youker; if "Cassie" is the same as Vandeveer; or the basis for asserting that Jason Youker is the Iceman.

On May 17, Paulette Robertson called a Task Force CI to inquire whether he or she wanted to purchase heroin. Task Force Commander Steven Brown approved a "controlled buy," and the CI, with Brown surreptitiously following, went to Robertson's trailer to purchase heroin. CP at 20. With the CI in the trailer, Brown observed an unidentified male drive a maroon and silver Dodge Dakota pickup truck to Robertson's home. The unidentified male entered Robertson's trailer.

On May 17, Sergeant Wilson and Detective Kim, of the Task Force, covertly arrived in a separate car at Robertson's Oroville trailer. The two recorded the license plate number of the maroon and silver truck. Officers later identified the owners of the truck as Dorothy and Jason Youker, but the warrant affidavit does not identify Youker as the man who drove the truck on May 17. Dorothy Youker is Jason's deceased mother.

After leaving the Robertson trailer on May 17, the CI called Detective Brown and informed him that he or she purchased heroin. The two met to discuss the transaction and to transfer the heroin to Brown. The CI told Brown that Robertson had four bags of heroin and the CI purchased two of the bags with the control buy money. The CI asked

4

Robertson where she got "her stuff," and Robertson replied that her supplier was "the ice cream man." CP at 21. The CI told Brown that he or she believed the driver of the maroon and silver truck to be "the ice cream man" and that he or she "believed" the ice cream man arrived to retrieve the purchase money. CP at 21. The CI, however, never saw the unidentified male deliver any drugs or take any money.

On May 17, the driver of the maroon and silver Dodge Dakota left the Robertson trailer as the CI left. Police followed the unidentified driver to Youker's 22nd Avenue residence in Oroville. The search warrant affidavit lacks any information as to whether the tailing officers saw who exited from the pickup.

On June 2, police executed a search warrant at Paulette Robertson's trailer. Police seized marijuana, methamphetamine, and a digital scale, for which she was arrested.

On September 24, Oroville Police Officer Todd Hill stopped Cassandra J. Vandaveer, a felon with a conviction for possessing a controlled substance. Vandaveer drove Youker's truck. When Officer Hill approached the truck, he saw a pistol tucked between the seats. Vandaveer told Hill it was just a pellet pistol. Hill arrested Vandaveer for driving with a revoked license and asked for consent to search. Vandaveer declined. Hill called Border Patrol, who ran a drug detecting dog around the car. The dog caught a scent at the passenger side door. While police awaited a telephonic search warrant, Youker arrived at the scene to recover his truck. Police informed him that he could not

5

take his truck home because a drug dog alerted officers to the presence of drugs. The police executed a search warrant, but did not find any drugs in the truck.

The search warrant affidavit declares that police identified, from the September 24 encounter, Jason Youker as the Iceman. The affidavit does not explain how officers made this identification.

On December 16, a CI sought to purchase methamphetamine from Jeffrey Clark, a felon with a conviction for the possession of marijuana. Clark told the CI that she or he could purchase methamphetamine at the Iceman's house. Clark brought the CI to Jason Youker's residence, but they were unable to buy methamphetamine because the Iceman was not home. According to the CI, Clark called the Iceman and was told that he was at the casino in Okanogan.

Detective Brown in the search warrant affidavit states that the Iceman is likely Jason Youker because law enforcement officers had recently followed Youker two miles south outside of Oroville, in the direction of the Okanogan casino. But as the trial court noted at the suppression hearing, the casino is 50 miles from Oroville.

On January 14, 2012, Ledawn Marie Jones-Morish told Detective Thomas of the Task Force that she purchased methamphetamine and heroin from the Iceman in the past. She purchased through a wooden fence located on the east side of his home because he did not want traffic at his home. She told police she saw the Iceman and could identify his voice. The search warrant affidavit contains no identification or confirmation of a

6

hole in the fence. At the suppression hearing, Jason Youker noted that his eastside fence is three feet tall. He asserted one could not hide by selling drugs from behind the fence, so Jones-Morish's statement is incredible.

On February 1, Elizabeth Barton and Efren Federico Lopez parked in an orchard near Jason Youker's residence, when police arrested Lopez for outstanding warrants. When the arresting officer asked why the two waited in the orchard, Lopez replied that he desired to purchase methamphetamine, but his dealer asked buyers not to come to his house. The officer asked Lopez if he intended to purchase from Youker. Lopez did not know the name of the dealer.

Detective Brown included in his search warrant affidavit recorded jail conversations dated February 2, 2012, between Arthur Leroy Sims, Jr. and unidentified females. In the telephone calls, Sims tells the ladies he believes that the police have jailed the Iceman, and the Iceman is selling dope for the cops.

On February 3, officers responded to a report of a heroin overdose at the Camaray Motel in Oroville. Officers discovered, at the hotel, an unconscious female suspected of overdosing on heroin and an unidentified female. The unidentified female left while officers tended to the unconscious female. After reviewing motel tapes and talking with the cab driver who drove the unidentified woman to the motel, Officer Chris Patterson identified the woman as Teresa Marie Munsey. The tapes showed she entered before the overdose occurred and remained until after the police arrived. According to Brown's

7

affidavit, Munsey then lived at Jason Youker's residence. Police later cited Munsey for driving with a suspended license at a time she drove Youker's truck.

Teresa Munsey was known to maintain a relationship with Chad Inscore. Inscore has a conviction for drug paraphernalia in Nevada and was arrested for possession of methamphetamine in Ferry County, Washington.

On March 2, police identified a car registered to Edward Boekel parked at Jason Youker's residence. Boekel is a felon convicted of selling morphine, heroin, and other drugs. Based upon information obtained through a search warrant served at Boekel's residence and a controlled purchase from Boekel, Ferry County Detective Talon Venturo believed Youker supplied Boekel with controlled substances. The search warrant affidavit did not specify the facts upon which Venturo relied to form his belief.

On March 3, Oroville Police Chief Clay Warnstaff saw Calvin Duane Garrison leave Jason Youker's residence and drive into Prince Hardware's parking lot. Warnstaff followed Garrison. Garrison entered Prince's and, upon exiting, looked in the direction of Warnstaff. Garrison sat in his car for about five minutes before exiting the vehicle and returning to the store. After 20 minutes without seeing Garrison, Chief Warnstaff left. Garrison was arrested three times, in the 1980s, for drug possession.

On March 23, Detective Thomas interviewed Ledawn Jones-Morish at the Okanogan County jail. Jones-Morish began the conversation by stating: "I thought you guys didn't want to work with me." CP at 28. Thomas questioned her anyway. Jones-

8

Morish described the Iceman's fence as wooden with knot holes and it was located on the downhill side or east side of the Iceman's property. She stated she sometimes retrieved drugs from deals with the Iceman from inside an abandoned vehicle. The last time she purchased from the Iceman was in his front yard. Jones-Morish stated she could identify the Iceman's voice, but the search warrant affidavit gives no description of the voice.

Ledawn Jones-Morish told Detective Thomas, during the March 23 jail interview, that John Meslar is the Iceman's biggest purchaser. The search warrant affidavit does not provide the basis for Jones-Morish's statement. The Task Force had arrested John Meslar for purchasing, during controlled buys, controlled substances.

At the suppression hearing, Jason Youker argued that the finding of probable cause entered by the judge issuing the warrant was not supported by substantial evidence. The trial court noted that it must grant considerable deference to the issuing magistrate and refrain from an overly technical examination of the affidavit. The trial court did not relish the role of "Monday Morning Quarterback," particularly because the court "cannot possibly appreciate the difficulty and frustration of narcotics investigation." CP at 3. Yet, after reviewing the affidavit, the trial court found "too much of the case against [Youker] is implied or circumstantial. No one provides clear testimony that they [sic] ever saw drugs at the home or got drugs from [Youker's] home." CP at 5. The court suppressed the evidence and dismissed the case without prejudice.

When dismissing the charges, the trial court entered extensive findings of fact,

which include:

1. Of the many witnesses, not one directly stated that Jason Youker is the "Iceman" or "Ice Cream Man." The investigating officers believed this was so. (E.G. page 8, last 2 lines of 2nd paragraph.)

    . . . .

4. On 5/17/2011 the informant purchased heroin from Paulette Robertson at her trailer. While the informant was in the trailer[,] observers saw Defendant's pickup truck arrive. An unidentified male got out of the truck and walked toward the trailer. Paulette said she got the heroin from the Iceman. The informant stated that he believed the Iceman was driving the truck and that he came to Paulette's to get his money. However the informant did not know the identity of the driver; did not see him get money and did not see him deliver drugs. The affidavit is not clear on this point but it appears that Paulette had the heroin before the Iceman arrived. The informant was never later asked to identify the Defendant as the driver. The truck departed and was followed back to Defendant's home. This information establishes that the Iceman used Defendant's truck and returned to Defendant's home. It provides circumstantial evidence of the Iceman's identity. However, it does not convincingly show that the Iceman delivered the heroin.

5. On 9/24/11 police stopped Cassandra Vandeveer driving Defendant's truck. Defendant arrived and verified ownership. A search warrant produces no drugs or paraphernalia. The affidavit states that this stop helped them identify the male they knew as Iceman or Ice Cream Man. The supporting facts are not provided.

6. On 1/14/12 LaDawn Jones-Morish told officers that she buys meth and heroin from Iceman. The last buy was December 29, 2011. She always made purchases through a hole in the fence near his home. She said the fence was wood with knotholes and was located on the down-hill side of the house. She did not identify the house by address or photograph. She did not provide a description or identify Iceman by photograph. Photographs of Defendant's home included in the affidavit do not clearly support her testimony. (They may contradict her testimony but the business of interpreting photos is

10

risky.) No explanation or elaboration was provided to the Magistrate. No information about her credibility was provided.

CP at 3-4.

## LAW AND ANALYSIS

### Findings of Fact

Before addressing the merits of the appeal, we address an error assigned by the State and one argument of Jason Youker. The State assigns error to four findings of fact. In turn, because the State does not pen four discrete assignments of error, but assigns error to the four findings with one assignment of error, Youker argues the State waived the assignments of error. RAP 10.3(g) directs the appellant to include, in its brief, a separate assignment of error for each finding of fact it challenges.

We decline to entertain either party's contention. The trial court based its decision solely on a review of Detective Brown's search warrant affidavit. The trial court did not entertain any live testimony. We are in the same position as the trial court since the factual record consists solely of documentary evidence and an affidavit. *Cornu-Labat v. Hosp. Dist. No. 2 Grant County*, 177 Wn.2d 221, 229, 298 P.3d 741 (2013). Under such circumstances, the reviewing court is not bound by the trial court's factual findings. *Id.* We examine the warrant de novo, *State v. Perez*, 92 Wn. App. 1, 4, 963 P.2d 881 (1998), and thus consider the findings of fact superfluous.

Trial Court's Standard of Review

The State argues that the trial court did not give deference to the magistrate's decision to issue the search warrant. The issuance of a search warrant is reviewed only for abuse of discretion. *State v. Maddox*, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004). Trial courts accord a magistrate's determination of probable cause "*great* deference." *Maddox*, 152 Wn.2d at 509; *State v. Clark*, 143 Wn.2d 731, 748, 24 P.3d 1006 (2001) (emphasis added).

The trial court wrote that it gave "*considerable* deference" to the magistrate. CP at 3 (emphasis added). We do not believe there to be a significant difference in quantum of deference between "great" and "considerable" deference, particularly since both terms are qualitative in nature and our high court has used both "considerable" and "great" when describing the deference due the magistrate. *State v. Kalakovsky*, 121 Wn.2d 525, 531, 852 P.2d 1064 (1993).

We conclude that the trial court gave due deference to the magistrate. The deference to be afforded "is not boundless." *Perez*, 92 Wn. App. at 4. Courts will not defer to a magistrate's decision when it is based on information insufficient to establish probable cause. *Id.* Deference should not allow the reviewing court to add a missing link in the chain needed to connect the criminal activity to the area to be searched. "We examine the warrant de novo," *Perez*, 92 Wn. App. at 4, and as analyzed below, we like

12

the trial court, find a lack of probable cause even with due deference given the magistrate.

## Probable Cause

The key question raised below and on appeal is whether the affidavit of Detective Steven Brown provided probable cause for the issuance of the search warrant of Jason Youker's residence. Probable cause exists if a reasonable, prudent person would understand from the facts contained in the affidavit in support of the warrant that the defendant is probably involved in criminal activity and that evidence of the crime can be found in the place to be searched. *Maddox*, 152 Wn.2d at 509; *In re Yim*, 139 Wn.2d 581, 594-95, 989 P.2d 512 (1999). Accordingly, "'probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.'" *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999) (quoting *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)).

Several critical principles behind probable cause compel our decision. "'Probable cause cannot be made out by conclusory affidavits.'" *Thein*, 138 Wn.2d at 140 (quoting *State v. Helmka*, 86 Wn.2d 91, 92, 542 P.2d 115 (1975)). The information contained in the warrant "must state the underlying facts and circumstances on which it is based in order to facilitate a detached and independent evaluation of the evidence by the issuing magistrate." *Thein*, 138 Wn.2d at 140 (citing *State v. Smith*, 93 Wn.2d 329, 352, 610 P.2d 869 (1980)). "[T]he record must show the existence of objective criteria going

13

beyond personal beliefs and suspicions of the applicants for the warrant." *State v. Patterson*, 83 Wn.2d 49, 61, 515 P.2d 496 (1973)). "Absent a sufficient basis in fact from which to conclude evidence of illegal activity will likely be found at the place to be searched, a reasonable nexus is not established as a matter of law." *Thein*, 138 Wn.2d at 147. "[T]hat nexus may be established either through direct observation or through normal inferences." *State v. O'Neil*, 74 Wn. App. 820, 824-25, 879 P.2d 950 (1994) *overruled on other grounds by Thein*, 138 Wn.2d at 149 (quoting *United States v. Freeman*, 685 F.2d 942, 949 (1982)).

The State contends that, regardless of whether the information in the affidavit was sufficient to identify Jason Youker as the "Iceman," substantial evidence established criminal drug activity occurred at his residence and contraband would be found there. Along these lines, the State contends a nexus is established by direct evidence of drug activity originating from the residence. Nevertheless, the affidavit of probable cause does not identify a single incident tying drug activity to Jason Youker's residence. On May 17, 2011, police followed a person driving Youker's truck from a controlled drug buy at Paulette Robertson's trailer to Youker's residence. But the CI inside Robertson's trailer during the controlled buy never observed the driver handle money or drugs.

On December 16, Jeffrey Clark, a dealer of methamphetamine, told a CI he could get methamphetamine at the Iceman's house. Clark and the CI went to Youker's residence twice to purchase methamphetamine. However, the Iceman was not home.

14

Police terminated that attempt to buy and no other attempts to purchase drugs from the Iceman or from that house were ever made.

Without a witness who can attest to observing criminal activity at Youker's residence, the State relies on what Clark told a CI. But Clark's credibility is not established in the affidavit. Thus, there is no objective basis to evaluate Clark's allegation that the CI could purchase methamphetamine from Youker's residence.

Law enforcement also failed to establish the credibility of Ledawn Jones-Morish. Even accepting her testimony as true, however, she does not establish probable cause because she does not implicate Jason Youker's residence. Jones-Morish told police she buys methamphetamine and heroin from the Iceman through a hole in the fence located on the eastside of his home. She did not identify the house by address or photograph. She did not accompany law enforcement to the location where she claimed she purchased drugs. She did not provide a description or identify Iceman by photograph. Photographs of Jason Youker's home included in the affidavit do not support and may contradict her testimony.

The claim that Jason Youker supplied Edward Boekel drugs is insufficient to establish probable cause because the affidavit contains no objective basis for the magistrate to evaluate the claim. Police identified a car registered to Edward Boekel, a known drug dealer, parked at Youker's residence. Ferry County Detective Venturo believed Youker is Boekel's supplier based on "prior investigation, information received,

15

search warrant served at Edward and Lisa's home and the controlled purchases made from Edward." CP at 27. But none of the underlying facts and circumstances on which his belief is based is contained in the affidavit. Boekel was never seen purchasing drugs at the Oroville residence.

Two people are alleged to live at Jason Youker's residence, Teresa Munsey and Youker. When Teresa Munsey was stopped while driving Jason Youker's truck and a drug dog alerted police to the passenger-side door, no drugs or paraphernalia were found. While Munsey lived at Youker's residence, police identified her at the scene of a drug overdose at the Camaray Motel. But police did not implicate her in any criminal activity. The State does not allege Munsey has a criminal record or reputation. None of the information in the affidavit refers to Marie Munsey or Jason Youker using or distributing drugs.

In short, the State's affidavit of probable cause did not support the likelihood that criminal activity was occurring in Jason Youker's home.

## CONCLUSION

We affirm the trial court's suppression of evidence and dismissal of the charges without prejudice.

16

No. 30977-1-III
*State v. Youker*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, A.C.J.

Kulik, J.