# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 71811-8-I |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER T. CHAVEZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 31, 2015 |
| | ) | |

DWYER, J. — Christopher Chavez was charged with and convicted by jury verdict of two counts of child molestation in the first degree. On appeal, Chavez contends that the trial court erred (1) by refusing to conduct an in camera review of the alleged victim's counseling records, (2) by limiting his cross-examination of a key witness, and (3) by barring him from calling a particular impeachment witness. Because Chavez does not establish an entitlement to relief on any of these grounds, we affirm.

I

Chavez was a long-time personal friend of Brittany Barbosa and had a close relationship with her three daughters, A.R., Se., and Sa., whom he had known since they were born. He babysat for the children frequently, and even cared for them for extended periods of time when Brittany went on vacation.

In June 2011, Brittany married Julio Barbosa. Chavez was the officiant at their wedding. On two occasions after Brittany and Julio were married, Chavez

lived with Brittany and the children. The first instance was from September 2011 to May 2012, when Julio was deployed to Afghanistan. The second occasion commenced in February 2013, after Julio returned from Afghanistan.

In March 2013, A.R. was nine years old. On the evening of March 13, A.R. and her younger sister, Se., were watching movies with Chavez in his bedroom. Brittany was in her own room, and Julio had fallen asleep on the couch.

A.R. and Se. got onto Chavez's bed with him and started watching a movie. A.R. fell asleep about twenty minutes into the movie. However, A.R. was "not fully asleep yet" and "kind of woke up." She then played a game with Chavez in which he drew letters on A.R.'s arm and she tried to guess the letters. A.R. taught Chavez to play the game on her arm, but he moved it to her stomach. A.R. told him it was not supposed to be played that way. A.R. fell back asleep.

The next thing A.R. remembered was waking up to Chavez touching her breasts with his hand, skin to skin, with his hand under her shirt. She realized that while she had been sleeping, Chavez had switched places with her sister. She pushed his hand away. Chavez asked A.R., "Do you want me to stop or keep going?" Instead of answering, A.R. ran out of the room. On her way out of the door, A.R. heard Chavez say, "Wait. Come back."

Sometime after midnight, Julio was awakened by A.R., who told him that Chavez had touched her. A.R. was nervous and shaking. Julio asked her where on her body Chavez had touched her, and she pointed to her chest area. She

later told a child interviewer that she could feel Chavez touch her chest area "just a little" because she had awakened to the sound of her sister.

Julio took A.R. to the bedroom where Brittany was sleeping and reported that Chavez had touched A.R. inappropriately. A.R. did not want to talk about what had happened, so Brittany pointed to parts of A.R.'s body and asked where Chavez had touched her. A.R. nodded her head when Brittany pointed to her breast area.

Brittany wanted Chavez to leave, so Julio went to Chavez's room and said, "[A.R.] says you touched her. You have to go." Chavez immediately said that he had not touched her. According to Julio, Chavez then asked him, "Do you want to hit me?"

At about 1:30 AM on March 14, Chavez got into his car and telephoned his friend Rayanne Grim. He wanted to go to her home but would not explain why over the telephone. Chavez would only say that he got kicked out of Brittany's house. When he arrived at Grim's house, Chavez joined her on the back porch and smoked a cigarette. He was pacing and nervous. He threw his hands in the air and said, "I touched [A.R.]." He explained that he had been in his room with A.R. watching a movie and he was drawing letters and words on her stomach and accidentally touched her chest. Chavez could not explain how this happened. Grim allowed him to stay the night at her home but informed him the next day that he had to leave because she was not comfortable with what he had done.

Later on March 14, Chavez met Julio back at the Barbosas' apartment. Chavez told Julio that he felt like he should "make amends" for what he did. He wanted to know if Julio was going to call the police. Julio and Brittany called the police the next day.

On March 18, A.R. was interviewed by Gina Coslett, a child forensic interview specialist. During that interview, A.R. disclosed for the first time that Chavez had touched her on another occasion some weeks earlier.

On that occasion, Chavez molested A.R. inside a storage building on Grim's property, in which Chavez kept many of his belongings.[1] As A.R. recounted, Chavez started by sitting with A.R. on a couch and "testing if [A.R.] could count by twos all the way to 100." Chavez then placed his hands on A.R's "boobs" and felt them by using all of his fingers in one motion, bringing his fingers towards his palm multiple times. This lasted a couple of minutes before A.R. pushed his hands away from her chest.

Chavez drove A.R. home, and on the way he asked her if she was "okay." A.R. did not respond because she did not want to talk to him. She said it did not "feel like it was right what he did." A.R. decided not to tell her mother about Chavez's misbehavior because she "wanted to give him a second chance." A.R. also said that she did not tell her mother about it because she "kind of forgot about it."

Chavez was prosecuted for two counts of child molestation in the first

---

[1] Chavez took A.R. on errands to Grim's residence on February 16, 2013 and March 3, 2013. It is not clear on which date the events described occurred.

- 4 -

degree. A jury convicted Chavez of both counts as charged. He was sentenced to indeterminate concurrent terms of incarceration of 80 months to life.

II

Chavez first contends that the trial court denied him due process by refusing to conduct an in camera review of A.R.'s counseling records.[2] This is so, he asserts, because he had established their materiality. We disagree.

Prior to trial, Chavez sought the release of records from two counseling sessions that A.R. attended at Compass Health in May 2013.[3] The court held two hearings on the issue.

At the first hearing, on January 16, 2014, Chavez claimed that "the government set [A.R] up into counseling for sex abuse." He argued that the counseling records were necessary to vet his theory that "suggestive questioning" led to the disclosure during the forensic interview. This theory was bolstered, Chavez asserted, by an expert who had "reviewed the videotape" of A.R.'s forensic interview (during which she first disclosed the incident that occurred in the storage space on Grim's property),[4] but Chavez did not file any third party affidavits to support his assertion. The trial court did not decide the

---

[2] Chavez also contends that this alleged error violated his Sixth Amendment right to confront and cross-examine adverse witnesses. However, such a claim is contrary to the view espoused by the United States Supreme Court in Pennsylvania v. Ritchie, 480 U.S. 39, 54, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (plurality opinion). Similarly, the Washington Supreme Court did not ground its decision in State v. Gregory, 158 Wn.2d 759, 147 P.3d 1201 (2006), discussed infra, in the Sixth Amendment. Both decisions rested, instead, on due process principles.

[3] The State did not have possession of the requested records, so Chavez moved the court to authorize the issuance of subpoenas to Compass Health.

[4] In his underlying "motion for release and production of records," Chavez also asserted that he had reached out to "numerous" potential experts and that these experts had "raise[d] serious questions about the legitimacy of this prosecution."

issue at this hearing but, instead, granted the State's motion to continue the hearing so that A.R's personal attorney could file a response to Chavez's request.[5]

At the next hearing, held on February 13, the trial court took testimony from victim advocate Annette Tupper, an employee of the Snohomish County Prosecutor's Office, to determine why A.R. had been referred to counseling. Tupper's testimony established that the counseling referral was not a direct result of the alleged abuse but, rather, resulted from Brittany's report that A.R. was experiencing trouble sleeping.

The trial court was also presented with evidence about the content of the counseling sessions by way of a transcript of a defense interview of Brittany. In the interview, Brittany stated that A.R. generally participated in the counseling alone, without Brittany. When asked whether she knew what was covered in the sessions, Brittany stated, "She doesn't always tell me exactly. I, I kind of let her be the judge of if she wants to tell me what she talked about that day or if she doesn't." Recalling what she knew had been done in counseling, Brittany stated, "She made this little beady thing. It's a string and she holds onto it. And like she counts to 10 and she tries—it's supposed to be like a coping mechanism to like kind of calm her down. And I found in her dresser, and I asked her about it, and there was these little cards that had positive things about her. . . . I guess in one of her counseling sessions she was told to write what is good about her." When asked whether she knew if the alleged abuse had been "revisited" in the

---

[5] A.R's attorney filed that response, opposing the request, on February 5, 2014.

counseling, Brittany recounted, "[A]t the initial visit I had to tell the counselor what happened. And kind of give her a little gist of what happened. And that, as far as I know, is the only time it was spoke of." She also stated that A.R. was in the room at the time she summarized the alleged abuse for the counselor.

Before making its ruling, the trial court attempted to clarify the basis for Chavez's repeated claim that the government had arranged the counseling specifically so that A.R. would talk about the abuse. The following exchange transpired:

> MR. FONG [defense counsel]: . . . [T]his counseling session, it wasn't set up because the alleged victim wanted it, it wasn't set up because a mental health professional recommended it. It was set up by the government to engage in this kind of counseling, to talk about specifically this event.
> THE COURT: So, Mr. Fong, I have to stop you right there. What is your basis for making that statement that the counseling has been set up by the government for the purpose of having the child discuss, talk about this event? What is your factual basis for that statement?
>
> . . . .
>
> MR. FONG: Well, my basis is I think it's a reasonable inference from the facts, and also 18 years of doing a lot of criminal defense and public defense and just knowing that this is what happens.
> And you're right, though I've never actually gone – so it's just an inference off of the facts, and so that's -- and that's the second argument for the basis, that the real basis is the mother in the presence of the child telling the counselor.

After hearing from each of the parties, the trial court denied Chavez's request, explaining that, "The Court understands and respects your view that this [review of the records] may produce valuable information to the defense, but your belief that it may is based upon supposition, it's based upon inference. It's not based upon any facts." Chavez now challenges this decision.

Counseling records are generally privileged. RCW 5.60.060(9). "[F]or due process to justify in camera review of a record that is otherwise deemed privileged or confidential by statute, the defendant must establish 'a basis for his claim that it contains material evidence.'" State v. Gregory, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed.2d 40 (1987)), *overruled on other grounds by*, State v. W.R., Jr., 181 Wn.2d. 757, 336 P.3d 1134 (2014). The defendant "must make a particularized factual showing"—mere speculation is not enough. State v. Kalakosky, 121 Wn.2d 525, 550, 852 P.2d 1064 (1993); accord State v. Diemel, 81 Wn. App. 464, 469, 914 P.2d 779 (1996) ("A claim that privileged files might lead to other evidence or may contain information critical to the defense is not sufficient to compel a court to make an in camera inspection."). "Evidence is material only if there is a reasonable probability that it would impact the outcome of the trial. A reasonable probability is probability sufficient to undermine confidence in the outcome." Gregory, 158 Wn.2d. at 791 (citation omitted).

We review a trial court decision granting or denying a request to view privileged counseling documents for abuse of discretion. Gregory, 158 Wn.2d. at 791. A trial court abuses its discretion when its decision is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons. State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

Herein, Chavez asserted that "[i]t is a fact that evidence directly related to these allegations [of abuse], and A[.]R[.]'s perceptions of what allegedly

- 8 -

happened are in these record[s].["6] And, indeed, he presented some evidence in support of his assertion. In particular, he proffered Brittany's statement that, at the outset of the counseling, she had briefly explained the alleged abuse to the counselor in front of A.R. Chavez also relied upon his attorney's "18 years of doing a lot of criminal defense and public defense and just knowing that this is what happens." But this, of course, was pure speculation.

In contrast, to support its contention that the abuse was not the subject of A.R.'s one-on-one counseling, the State and A.R.'s personal attorney relied both upon Tupper's testimony that she had made the counseling referral due to A.R.'s trouble sleeping and upon Brittany's statements indicating that, as far as she could ascertain, A.R. had spent her time in counseling hand-making tools to help her cope, including a beaded talisman and cards with written affirmations. In context, Chavez's basis for asserting that the counseling records contained evidence of A.R.'s perceptions of the alleged abuse was weak.

Moreover, Chavez failed to establish the materiality of the records by connecting their asserted, expected content to his theory of the case. A.R. disclosed abuse by Chavez in the early morning of March 14, just after the alleged incident on Chavez's bed, and again on March 18, during the forensic interview (describing the alleged incident in the storage space on Grim's property). Chavez's theory was that these disclosures were the product of suggestion or suggestive questioning. Alternatively phrased, Chavez's theory

---

[6] Defendant's motion for release and production of records at 5.

was that the disclosures were a reflection of "learn[ed] truths."[7] But Chavez never explained how counseling that took place in *May* 2013 could have contributed to a process of suggestion that allegedly led to A.R.'s disclosures in *March* 2013. On its face, Chavez's theory of causation runs contrary to the undisputed timeline of events. In addition, Chavez did not explain, either in the trial court or on appeal, how this process allegedly worked. When asked about his theory at oral argument in this court, Chavez's attorney demurred, stating that "[he] was not an expert on suggestibility."[8] Furthermore, although Chavez claimed that his theory was "based on conversations with experts" in child psychology, he provided no evidence from such an expert explaining how the process of suggestion might have worked in this case in such a way as to make the counseling records relevant. In short, Chavez did not provide a coherent theory of the materiality of the counseling records.

Given these shortcomings in Chavez's application, the trial court did not abuse its discretion by declining to release or conduct an in camera review of A.R.'s Compass Health counseling records.

III

Chavez next contends that the trial court violated the "rule of completeness" by prohibiting him from asking Grim about statements that he allegedly made to her. This is so, he asserts, because the alleged statements

---

[7] Defendant's motion for release and production of records at 5.
[8] Oral argument, 6:40.

were part of a conversation about which the State had examined Grim at length. Chavez is correct, in part, but the sole trial court error was harmless.

The "Rule of Completeness," as codified in ER 106, allows an adverse party to introduce the remainder of a "writing or recorded statement" at the time the opposing party introduces part of that writing or recorded statement, if the remainder "ought in fairness to be considered contemporaneously with it." ER 106. Although the language of the rule does not apply to unrecorded oral conversations, such as the evidence at issue herein, courts have applied the rule to oral conversations. See, e.g., State v. Larry, 108 Wn. App. 894, 910, 34 P.3d 241 (2001).

In an effort to determine which omitted portions of an oral conversation are "needed to clarify or explain the portion already received," United States v. Haddad, 10 F.3d 1252, 1258-59 (7th Cir. 1993), the Larry court adopted the four part test from United States v. Velasco, 953 F.2d 1467, 1475 (7th Cir. 1992). Pursuant to that test, the offered statement must be relevant and must: (1) explain the admitted evidence, (2) place the admitted portions in context, (3) avoid misleading the trier of fact, and (4) insure fair and impartial understanding of the evidence. Velasco, 953 F.2d at 1475. The test is conjunctive. Velasco, 953 F.2d at 1475.

A trial court has wide discretion in ruling on the admissibility of evidence. A trial court's decision to admit or exclude evidence will not be reversed on appeal absent abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30

P.3d 1278 (2001). A trial court abuses its discretion only if no reasonable judge would adopt the view espoused by the trial court. Demery, 144 Wn.2d at 758.

During his cross-examination of Grim, but outside the presence of the jury, Chavez asked the trial court for a preliminary ruling on the admissibility of three specific questions that he intended to ask Grim.

The three questions were as follows:

1. "[I]sn't it true that you told Mr. Barrett[9] that you asked Chris if he did this . . . and he said no?"

2. "[I]sn't it also true you told Mr. Barrett that Chris was adamant that he said he didn't do it?"

3. "[I]sn't it true that you told Mr. Barrett that -- that Chris told you that he thought Julio was going to hit him?"

The trial court ruled that the first question was proper impeachment of Grim's prior testimony and that it could be posed to the witness. However, the trial court ruled that the second question, which focused on how adamant Chavez was in his denials, and the third question, which focused on Chavez's fear of being physically harmed by Julio, were not meant to impeach Grim's prior testimony and were more in the nature of "self-serving hearsay."[10] Chavez now challenges the trial court's rulings with respect to the second and third proposed questions.

We begin with the last question. Unlike with the others, Chavez made no offer of proof regarding this question. That is, he offered no explanation as to

_____

[9] Ed Barrett is Chavez's stepfather. The proposed line of questioning relates to a conversation between Barrett and Grim wherein they discussed the incidents of March 14 and the allegations against Chavez.

[10] Division Three aptly noted in State v. Pavlik, 165 Wn. App. 645, 653, 268 P.3d 986 (2011), that "there is no 'self-serving hearsay' bar that excludes an otherwise admissible statement." The trial court's error in this regard is of no moment given the nature of our analysis.

how he would have used the information he sought. Moreover, it is not otherwise clear how the answer to whether Grim had told Barrett that Chavez had said that he thought Julio was going to hit him was relevant. The information sought fails the threshold relevance inquiry. Therefore, the trial court's ruling precluding this question was not an abuse of its discretion.

In contrast, the second question, regarding Chavez's adamant denial that he committed a crime, met all four factual predicates of the rule of completeness. The State placed primacy on his alleged admission to Grim, asserting, in its opening statement, that "She is the one who heard the defendant try to explain himself by beginning with I touched [A. R.]." The defense theory was that Chavez touched A.R.'s chest inadvertently. Chavez's denial could have explained and supplied context for the admitted evidence that Chavez had acknowledged touching A.R., helped to ensure that the jury was not misled by the State's partial presentation of that evidence, and ensured that the jury had a fair and impartial understanding of the evidence. The trial court's ruling barring Chavez from questioning Grim about the denial thus violated "the rule of completeness" and was, accordingly, erroneous.

Because this error is not of constitutional magnitude, however, we apply the nonconstitutional harmless error standard.[11] Under this standard, an error in

---

[11] The parties dispute which harmless error standard applies. Chavez argues that the constitutional standard applies because the exclusion of his self-exculpatory statements effectively deprived him of his Sixth Amendment right to confrontation. Under the constitutional harmless error standard, an error of constitutional magnitude is harmless only if the State can prove beyond a reasonable doubt that the jury would have reached the same result in the absence of the error. Chapman v. California, 386 U.S. 18, 21-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (an error of constitutional magnitude cannot be deemed harmless unless it is "harmless

the admission or exclusion of evidence is "'not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

The error herein was harmless for two reasons. First, given that Chavez was permitted to ask Grim whether Chavez had denied "do[ing] it," there is no reasonable possibility that the opportunity to ask whether he had done so "adamantly" would have changed the outcome of the trial. Second, before the jury, when asked whether Chavez had denied "do[ing] it," Grim answered that Chavez had not so stated. Grim having thus testified that Chavez had not uttered the asserted denial to her, it would have been nonsensical and objectionable for Chavez to have then asked the proposed follow-up inquiry as to whether Chavez was "adamant" in his denial.

Because, as Grim's testimony developed, the question at issue was one that could not reasonably have been posed, any error with respect to the trial court's challenged evidentiary ruling was harmless.

---

beyond a reasonable doubt."); accord State v. Maupin, 128 Wn.2d 918, 928-29, 913 P.2d 808 (1996).

But "a trial court that limits cross-examination through evidentiary rulings as the examination unfolds does not violate a defendant's Sixth Amendment rights unless its restrictions on examination 'effectively . . . emasculate the right of cross-examination itself.'" State v. Turnipseed, 162 Wn. App. 60, 69, 255 P.3d 843 (2011) (alteration in original) (quoting Smith v. Illinois, 390 U.S. 129, 131, 88 S. Ct. 748, 19 L. Ed. 2d 956 (1968)).

Herein, the trial court permitted Chavez to ask Grim about his alleged exculpatory statement. He was prevented only from asking how adamantly he made the statement. While the trial court's ruling was erroneous, it did not "effectively emasculate [Chavez's] right of cross-examination." Accordingly, the non-constitutional harmless error standard applies.

IV

Chavez next contends that the trial court erred by barring him from calling Barrett as an impeachment witness. However, it is clear from the record that the trial court did not, in fact, bar Barrett from testifying; instead, Chavez simply chose not to call him as a witness. Therefore, there was no trial court error.

Chavez first explained his plan to call Barrett as an impeachment witness when the trial court was addressing the issue of what questions could be asked during Chavez's cross-examination of Grim. Chavez explained that he planned to call Barrett as an impeachment witness if Grim's answers to his questions about what she discussed with Chavez on March 14 were different than that which she allegedly told Barrett. As Chavez's attorney explained:

> I would like to say, isn't it true that you told Mr. Barrett that you asked Chris if he did this, and isn't it – and he said no. And she's going to say – she's either going to say she said that or not. If she says, yeah, I said that, we're done. If she says no, then I have the right to impeach her with Mr. Barrett, that – that's my belief. So then the next question would be, and isn't it also true you told Mr. Barrett that Chris was adamant that he said he didn't do it, right? So that's kind of the flow of where I was going with this is to confront her with statements that she has made to another person and that she can either say I said it or not. If she says, no, then I have the right to – to impeach her.

As discussed above, the trial court ruled that Chavez could ask Grim one of the three questions that he had planned to ask about her conversation with Chavez.[12] When Chavez resumed his questioning of Grim shortly thereafter, he asked the question as planned.

---

[12] "MR. FONG: So I can ask the first question?
THE COURT: You sure can."

Q. And you also had conversations with one Ed Barrett.
A. I believe I spoke with him over the phone once briefly.
Q. And you also met with him in person when they – when they came out to gather some of Chris' belongings?
A. Yes, we didn't talk much.
Q. And isn't it true that you told them that you didn't write a statement because you were unsure given your clouded judgment?
A. I don't recall ever saying that.
Q. Okay. Isn't it true that you told Ed Barrett that you asked Chris – Chris if he did this and – and that Chris said no?
A. No.
Q. No, you deny saying that?
A. Yeah.

Later, during a discussion about scheduling that occurred before the State called its final witness, Chavez's counsel equivocated as to whether the defense would put on a case, stating, "[A]t this point I'm not sure I'm gonna put on a case." Yet, in the same exchange, Chavez's counsel also reiterated the possibility that he would call Barrett as an impeachment witness, stating, "I might want to call Dr. Coleman who is sitting around waiting to be called, or Mr. Barrett." The trial court acknowledged counsel's statement, responding, "Sure. Up to you." Thus, contrary to Chavez's present contention, the trial court expressly permitted Chavez to call Barrett as a witness if he so desired.

As it turned out, Chavez did not call Barrett as a witness. However, this was apparently the result of a trial tactic. It clearly was not the result of a trial court ruling.

Affirmed.

We concur: