

2016 JAN 11 AM 11:25

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71754-5-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| JOSEAPOLINAR FLORES-SOLORIO, AKA JOSE SOLORIO FLORES, | ) ) ) | FILED: January 11, 2016 |
| Appellant. | ) | |

APPELWICK, J. — Flores-Solorio appeals his conviction for charges related to his sexual abuse of three minors. He argues that the trial court erred in denying his motion to sever the charges. He contends that the trial court abused its discretion in permitting evidence of uncharged acts of sexual abuse of two other minors. He asserts that the trial court should have granted a mistrial when several witnesses alluded to excluded evidence. He alleges that his right to compulsory process was violated when the State did not request a special interest parole[1] for his out-of-country witnesses and the trial court did not continue the case. He

---

[1] In some cases, an individual who would otherwise be inadmissible to be present in the United States may qualify for a significant public benefit parole to be a witness in a proceeding. 8CFR § 212.5(b); U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, TOOL KIT FOR PROSECUTORS, at 24-26 (April 2011), http://www.ice.gov/ doclib/about/ offices/osltc/pdf/tool-kit-for-prosecutors.pdf.

argues that his defense counsel provided ineffective assistance by failing to move to compel the State to request parole for foreign witnesses. We affirm.

FACTS

In 2009, Joseapolinar Flores-Solorio[2] was charged with two counts of child molestation in the first degree, child molestation in the second degree, two counts of rape of a child in the second degree, and communicating with a minor for immoral purposes based on the sexual abuse of P.R.Y. and S.R.Y. P.R.Y. and S.R.Y. are twin sisters who were minors at the time of the abuse. Then, in 2010 the State filed charges against Flores-Solorio for the sexual abuse of another child, H.R.R. The trial court joined all of the charges against Flores-Solorio into a single trial.

P.R.Y. and S.R.Y. were born in Mexico and moved to the United States when they were six. Their mother grew up with Flores-Solorio in Mexico. This close connection led to Flores-Solorio and his family moving into P.R.Y. and S.R.Y.'s family home when the twins were about nine. Flores-Solorio's family consisted of himself, his partner, Isabel Sanchez, and their two children, O.F. and C.F. Sanchez babysat the twins and their younger siblings while their parents worked.

After moving in with them, Flores-Solorio began behaving inappropriately around P.R.Y. and S.R.Y. He watched pornography on the television while they were present. He also discussed sexual positions with them.

---

[2] Flores-Solorio is also known by the nickname "Polo."

And, Flores-Solorio began touching both P.R.Y. and S.R.Y. in ways that made them uncomfortable. He would rub P.R.Y.'s legs, inner thighs, and waist when no one else was around. On one occasion, Flores-Solorio attempted to put his hands down P.R.Y.'s pants while she was lying down. P.R.Y. did not disclose the abuse to S.R.Y. or anyone else. She was embarrassed, and she was afraid that if she told S.R.Y. she would learn that Flores-Solorio was abusing her as well.

Flores-Solorio was also abusing S.R.Y. He first touched S.R.Y. inappropriately when Flores-Solorio took her and her siblings to the beach. He offered to teach her how to swim. In the water, he pulled himself close to S.R.Y., and she could feel his erect penis. Flores-Solorio would often touch S.R.Y. between her thighs and under her shirt whenever he found himself alone with her. And, Flores-Solorio did more than touch the outside of her body. On one occasion, S.R.Y. felt ill at school, and Flores-Solorio picked her up and took her home. After she had gone to bed, he came in and put his hand down her pants, penetrating her vagina with his fingers.

Flores-Solorio and his family moved out of P.R.Y. and S.R.Y.'s home in 2002. But, he continued to abuse P.R.Y. and S.R.Y. Flores-Solorio and his family moved to an apartment in Kirkland, where P.R.Y. and S.R.Y.'s family often visited. P.R.Y. testified that when she spent the night at Flores-Solorio's apartment, he would come into the room where she, S.R.Y., and C.F. were sleeping and touch her over the sheets.

Then, in 2004, Flores-Solorio's family moved into a new house in Renton, and they hosted a housewarming party. The twins and their family attended. At

3

this party, Flores-Solorio insisted that S.R.Y. join him on a tour of the new house. Flores-Solorio took S.R.Y. upstairs, laid her on the bed, and pulled down her pants. He penetrated her vagina with his penis.

P.R.Y. first disclosed the abuse to her mother when she was 13. She was supposed to accompany her siblings on a weekend trip to Flores-Solorio's house, but she refused. P.R.Y.'s mother found her hiding and crying in her closet, terrified that Flores-Solorio would find her. P.R.Y. revealed to her mother that Flores-Solorio had been touching her inappropriately. Her mother confronted Flores-Solorio, but decided not to report him. P.R.Y. and S.R.Y. ultimately went to the police about the abuse after moving out of their mother's home in 2009.[3]

When Flores-Solorio and his family lived in Kirkland, his partner, Sanchez, babysat a number of children at their apartment. During the summer of 2003, Sanchez babysat H.R.R., who was six at the time, and her older sister. H.R.R. testified that Flores-Solorio was often home in the mornings when she was at the apartment. During that time period, Flores-Solorio touched H.R.R. in a way that made her feel uncomfortable. One day, H.R.R.'s sister did not come to Flores-Solorio's apartment with her, and Sanchez left to go to the grocery store. H.R.R. was lying down, and Flores-Solorio approached her wearing only a towel. He climbed on top of her and began rubbing her chest and vagina underneath her clothes. H.R.R. testified about another time where Flores-Solorio touched her in

---

[3] Both P.R.Y. and S.R.Y. received U-visas (nonimmigrant status visas) due to their involvement in both this case and another criminal case involving S.R.Y.'s allegations of sexual abuse by their stepfather.

4

the same way. And, on another occasion, Flores-Solorio put H.R.R. onto a bed, took off her pants and underwear, and penetrated her vagina with his penis.

H.R.R. was too afraid to tell anyone what happened to her. Years later, sixteen year old C.P. came to live with H.R.R.'s family. In June 2009, C.P. told H.R.R. about the things her stepfather had done to her. H.R.R. began crying, and revealed to C.P. that Flores-Solorio had done similar things to her. C.P. pushed H.R.R. to tell her mother, who took H.R.R. to the police station several days later.

In December 2009, the State filed charges against Flores-Solorio for the sexual abuse of P.R.Y. and S.R.Y. In February 2010, it filed charges against Flores-Solorio for the abuse of H.R.R. These charges were joined in 2013.[4] The amended information charged Flores-Solorio with three counts of child molestation in the first degree for acts involving P.R.Y., S.R.Y., and H.R.R. It also charged him with rape of a child in the second degree for S.R.Y., child molestation in the second degree for P.R.Y., and rape of a child in the first degree for H.R.R. Before trial, Flores-Solorio moved to sever the P.R.Y. and S.R.Y. charges from the H.R.R. charges. The court rejected his motion.

The State moved before trial to admit evidence of other victims under ER 404(b). The court decided to allow evidence of victims M.G. and E.G., who would each testify about a time when Flores-Solorio touched them inappropriately. The court excluded any evidence suggesting that Flores-Solorio abused his own daughter, C.F., because C.F. denied those allegations.

---

[4] Flores-Solorio was released after his initial arrest, and he returned to Mexico. This case was delayed because the State was required to extradite Flores-Solorio from Mexico to stand trial.

At trial, the State called several witnesses, including P.R.Y., S.R.Y., and H.R.R. E.G. and M.G., the ER 404(b) witnesses, also testified. Flores-Solorio called Sanchez, H.R.R.'s sister, and P.R.Y. and S.R.Y.'s mother and brother to discredit the victims. The jury found Flores-Solorio guilty as charged.

Flores-Solorio appeals.

## DISCUSSION

Flores-Solorio raises multiple arguments on appeal. He asserts that the trial court erred in denying his motion to sever the counts pertaining to P.R.Y. and S.R.Y. from those regarding H.R.R. Flores-Solorio also argues that the trial court abused its discretion by permitting the testimony of M.G. and E.G. pursuant to ER 404(b). He also contends that the trial court abused its discretion when it refused to grant a mistrial after the jury heard excluded evidence pertaining to Flores-Solorio's alleged abuse of C.F. And, Flores-Solorio claims that both the State and the trial court violated his right to compulsory process when he was unable to bring witnesses from Mexico to testify on his behalf. He alleges that defense counsel's failure to move to compel the State to request such a parole constituted ineffective assistance of counsel.

## I. Motion to Sever Counts

Flores-Solorio argues that the trial court erred in denying his motion to sever the abuse charges relating to P.R.Y. and S.R.Y. from those pertaining to H.R.R. After assessing the CrR 4.4(b) factors, the trial court concluded that Flores-Solorio had not met his burden of demonstrating that the possibility of prejudice outweighed the need for judicial economy.

CrR 4.4(b) permits a trial court to sever counts when "severance will promote a fair determination of the defendant's guilt or innocence of each offense." In reaching this conclusion, a trial court must consider: "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994). The court must then weigh any residual prejudice against the need for judicial economy. Id. This court reviews a decision whether to sever counts for a manifest abuse of discretion. State v. Kalakosky, 121 Wn.2d 525, 537, 852 P.2d 1064 (1993). The defendant bears the burden of demonstrating that the trial court abused its discretion. Russell, 125 Wn.2d at 63.

Flores-Solorio challenges the trial court's conclusions on each of the CrR 4.4(b) factors. He first contends that the State's evidence pertaining to P.R.Y. and S.R.Y. was much weaker than that pertaining to H.R.R. He claims that he cast serious doubt on P.R.Y.'s and S.R.Y.'s credibility through evidence that S.R.Y. and P.R.Y. were motivated by immigration benefits.

On the motion to sever, Flores-Solorio argued that recently discovered evidence would undermine P.R.Y.'s and S.R.Y.'s credibility. Specifically, Scott Clinton, with whom P.R.Y. and S.R.Y. lived when they left their mother's home, would testify that he had concerns about their trustworthiness. He had reason to believe P.R.Y. had shoplifted, and one of the twins made a comment about being able to stay in the United States now. The trial court recognized that this evidence

did somewhat weaken the State's case. Therefore, the trial court properly considered the evidence before it on this factor.

Flores-Solorio also contends the second factor is satisfied, because he had different defenses for each set of charges. Flores-Solorio told the court at the motion to sever hearing that his defenses were very different for P.R.Y. and S.R.Y. as opposed to H.R.R. Flores-Solorio intended to rely on witness testimony undermining P.R.Y.'s and S.R.Y.'s credibility. And, Flores-Solorio was considering testifying as to H.R.R. but not to P.R.Y. and S.R.Y. But, as the trial court acknowledged, Flores-Solorio's defense to both claims is denial. Although Flores-Solorio had different impeachment evidence for P.R.Y and S.R.Y than for H.R.R. Flores-Solorio did not show that these defenses contradicted each other. The jury could have compartmentalized the evidence. See Kalakosky, 121 Wn.2d at 537 (jury could compartmentalize the evidence where the victims described different attacks, but the perpetrator's methods were similar in each).

As to the third factor, the trial court explicitly instructed the jury that it was to consider each count separately. This factor weighs in favor of the trial court's decision.

Finally, Flores-Solorio contends that evidence of the abuse of P.R.Y., S.R.Y., and H.R.R. would not have been cross admissible in separate trials. While cross admissibility is a relevant factor under CrR 4.4(b), severance is not mandated if the crimes would not be cross admissible. See Kalakosky, 121 Wn.2d at 538. Moreover, due to the similarities amongst the victims' ages and the manner

of abuse, evidence of the other victims would have likely been admissible in separate trials to show a common scheme or plan.[5]

Flores-Solorio has not carried his burden of demonstrating that the trial court's refusal to sever the charges was a manifest abuse of discretion. We conclude that the trial court did not err in denying his motion to sever the charges.

## II. ER 404(b) Testimony

Flores-Solorio asserts that the trial court abused its discretion by admitting testimony about the alleged sexual abuse of M.G. and E.G. He contends that the alleged incidents of abuse of M.G. and E.G. constitute nothing more than opportunistic acts, and therefore cannot demonstrate a common scheme or plan.

Evidence of a person's past wrongs or crimes is not admissible to show the person acted in conformity with that character. ER 404(b). However, it may be admissible for another purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). This court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

For a trial court to admit evidence of prior acts to show a common scheme or plan, it must identify the purpose for which the evidence is sought to be introduced, determine whether the evidence is relevant to prove an element of the charged offense, and weigh the probative value of the evidence against its prejudicial effect. State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995).

---

[5] See infra, section II.

Additionally, the party offering the evidence must prove that the misconduct occurred by a preponderance of the evidence. Id. To show a common scheme or plan, the prior acts must be substantially similar to the charged offense. State v. DeVincentis, 150 Wn.2d 11, 20, 74 P.3d 119 (2003). However, this level of similarity does not require a unique method of committing the offense. Id. at 20-21.

Flores-Solorio asserts that the ER 404(b) evidence does not demonstrate a common scheme or plan, but only opportunistic acts. He contends that the commonalities amongst the acts are coincidental, and do not show that he manufactured the occasions to abuse the victims. He asserts that he did not plan the victims' ages or purposely become close to their families, so the evidence does not show a plan.

This argument ignores the commonalities between these crimes and misinterprets the common scheme or plan doctrine. For the doctrine to apply, the prior acts must be substantially similar to the charged offenses, such that they show the defendant had devised a plan and utilized it multiple times. See DeVincentis, 150 Wn.2d at 21. In other words, we look to the commonalities amongst the acts to determine if there was a plan, not for evidence that each act was planned. And, here the commonalities amongst the acts are substantial.

Flores-Solorio gained access to the victims in a similar manner—utilizing his close friendships and Sanchez's daycare business. E.G.'s family became close friends with Flores-Solorio's family after E.G.'s family moved to Flores-Solorio's neighborhood in Kirkland. M.G.'s mother was close to Flores-Solorio,

because they both grew up in the same town in Mexico. When Flores-Solorio needed a place to stay, M.G.'s mother told him he could park his van in her driveway and sleep there. P.R.Y. and S.R.Y.'s mother also grew up in the same town as Flores-Solorio. She allowed Flores-Solorio and Sanchez to move into their family's home in Woodinville, in exchange for help watching the children. H.R.R.'s mother, though not already a close friend of Flores-Solorio, first met him and Sanchez when she needed a babysitter. Thus, Flores-Solorio became close with the families of E.G., M.G., P.R.Y., and S.R.Y. before abusing them, and utilized Sanchez's daycare business to become close to P.R.Y., S.R.Y., and H.R.R.

And, the victims were all between the ages of six to eleven when Flores-Solorio began abusing them. H.R.R. was six years old when Flores-Solorio abused her. P.R.Y. and S.R.Y., the twins, were around nine years old when Flores-Solorio and his family moved into their family's house in Woodinville. Flores-Solorio began talking about sexual activities around P.R.Y. and S.R.Y. shortly after moving in, and then he began touching both of them. E.G. was around ten or eleven when she first met Flores-Solorio, and Flores-Solorio touched her inappropriately soon after that. M.G. was around six or seven when Flores-Solorio lived in her driveway for six months. It was during this time that he entered her home once and touched her.

And, the manner in which Flores-Solorio actually abused all five victims was similar. On several occasions, he began touching the girls while they were lying down or watching television. H.R.R. testified that on multiple occasions she was

11

lying down when Flores-Solorio climbed on top of her and began rubbing her chest and genitals. M.G. was sitting on the couch at night watching television when Flores-Solorio entered her house to go to the bathroom. He then sat down by her on the couch and began rubbing her legs, moving toward her inner thigh and crotch. P.R.Y. testified that after Flores-Solorio moved into her family's home, he began touching her inner thighs and legs when no one else was around. On one occasion, P.R.Y. was lying down and watching television when Flores-Solorio tried to touch her underneath her pants. S.R.Y. recalled that any time Flores-Solorio found her alone, he would touch her chest and between her thighs.

Flores-Solorio also pressed himself against several of the victims. He entered E.G.'s house with an excuse: he needed to use the restroom. Then, as she was doing laundry, Flores-Solorio came up behind E.G. and hugged her, pressing his penis against her. S.R.Y.'s first memory of Flores-Solorio touching her was when Flores-Solorio offered to teach her how to swim at the beach. In doing so, he stood close behind S.R.Y., pulling himself closer to her so that she could feel his erect penis.

Flores-Solorio also exposed himself to more than one of the children. P.R.Y. testified that Flores-Solorio was getting ready for work one day when she walked into the living room and he pulled down his zipper, exposing his penis. E.G. similarly testified that during the encounter in the laundry room, Flores-Solorio pulled down his pants and told her to look. She realized that he wanted her to look at his exposed penis.

12

Though the periods of abuse varied, Flores-Solorio continued abusing all of the victims for as long as he had access to them. He abused H.R.R. continuously during and after the summer that Sanchez provided childcare for H.R.R. He abused P.R.Y. continuously until P.R.Y. revealed the abuse to her mother and refused to be alone with Flores-Solorio again. And, he abused S.R.Y. whenever he was able to isolate her from the other children. But, Flores-Solorio's access to M.G. and E.G. was terminated shortly after the acts occurred. M.G. told her mother immediately after Flores-Solorio touched her inappropriately for the first time. M.G.'s mother confronted Flores-Solorio and informed him that he was no longer welcome to stay in their driveway. E.G.'s family lived near Flores-Solorio's family in Kirkland for only a brief period of time. E.G. testified that her family moved to Kirkland during the summer, and they left after only a few months.

Additionally, the acts here were not distant in time—they were concurrent with the charged offenses. Commission of the acts during the same period of time can also be a factor in demonstrating a common scheme or plan. State v. Thang, 145 Wn.2d 630, 643, 41 P.2d 1159 (2002). Here, the record shows that Flores-Solorio abused all five victims during the same time period. Flores-Solorio and his family lived with P.R.Y. and S.R.Y.'s family in Woodinville from 2000 to 2002. Flores-Solorio continued abusing S.R.Y. until at least 2004. H.R.R. was abused by Flores-Solorio during the summer of 2003, when Sanchez babysat her. E.G. was abused by Flores-Solorio in 2002 or 2003. M.G. was abused by Flores-Solorio in 2000 or 2001.

The substantial similarities amongst these acts show that Flores-Solorio had a common scheme or plan to molest prepubescent girls. He utilized his close friendships and Sanchez's daycare business to become close to the victims. He took advantage of opportunities to isolate the victims. And, when he was alone with them, he touched the victims' legs, genitals, and chests. The abuse continued for as long as he had access to them. Given these facts, the trial court did not abuse its discretion in admitting evidence of the uncharged acts of abuse of M.G. and E.G.

III.    Motion for Mistrial

Flores-Solorio also contends that his conviction should be reversed, because the trial court abused its discretion by refusing to grant a mistrial. He asserts that despite the court's ruling excluding evidence of his alleged sexual abuse of C.F., several witnesses testified about that abuse. He claims these statements were inherently prejudicial. Flores-Solorio argues that once the jury heard these statements, the only solution was for the court to order a new trial.

We review a trial court's denial of a mistrial for an abuse of discretion. State v. Rodriguez, 146 Wn.2d 260, 269, 45 P.3d 541 (2002). A trial court abuses its discretion only if no reasonable judge would have reached the same conclusion. Id. We overturn a trial court's refusal to grant a mistrial only if the error is substantially likely to have affected the verdict. Russell, 125 Wn.2d at 85. The trial court must consider three factors in deciding whether to grant a motion for a mistrial: "(1) the seriousness of the irregularity; (2) whether the statement was cumulative of evidence properly admitted; and (3) whether the irregularity could be

14

cured by an instruction." State v. Post, 118 Wn.2d 596, 620, 837 P.2d 599 (1992). The trial court should grant a mistrial only if nothing short of a new trial can ensure the defendant receives a fair trial. Rodriguez, 146 Wn.2d at 270. The potential for prejudice resulting from an irregularity is highest in sexual abuse cases. Gresham, 173 Wn.2d at 433-34.

Flores-Solorio points to three isolated statements from State witnesses insinuating that he also sexually abused his daughter, C.F. First, he cites to Detective Janelle McMillian's testimony that a detective from another agency called her to inform her that the detective had arrested Flores-Solorio. McMillian testified that the detective told her "there had been allegations involving him with two children" and "[t]hey were also concerned about his daughter." Second, he cites to P.R.Y.'s comment about C.F. during her testimony. When the prosecutor asked if she had any reason to believe Flores-Solorio was abusing S.R.Y., P.R.Y. responded, "His daughter would tell me like why don't you let yourself—." Finally, he points to E.G.'s testimony that, "when I told [P.R.Y.] about what had happened, she told me that Polo had something to do with his daughter as well." Flores-Solorio asserts that taken together, these statements were substantially prejudicial and the jury could not be guaranteed to disregard them.

Flores-Solorio argues that Washington case law controls the outcome in this case. He cites State v. Babcock, where the defendant was originally charged with sexually abusing two young girls, M.B. and A.T. 145 Wn. App. 157, 158, 185 P.3d 1213 (2008). At trial, the State introduced hearsay statements of A.T. through five witnesses. Id. at 161-62. Then, when the State called A.T., she refused to

15

testify. Id. at 162. As a result, the trial court ruled that A.T.'s previous statements were inadmissible, and it dismissed the charges as to A.T. Id. But, the trial court refused to grant a mistrial. Id. The Court of Appeals reversed, because the acts relating to A.T. were so similar to those relating to M.B. that it would be inherently difficult for the jury to disregard the testimony. Id. at 165-66.

Flores-Solorio also cites State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987). In that case, the defendant, Escalona, was charged with second degree assault with a deadly weapon—a knife. Id. at 252. Escalona had previously been convicted of an identical crime. Id. Before trial, the court excluded any reference to the earlier conviction. Id. But, at trial the State's key witness testified, unsolicited, that the defendant "already has a record and had stabbed someone." Id. at 253. There too the Court of Appeals reversed the trial court's denial of a mistrial. Id. at 256-57. It determined that the irregularity was extremely serious, because evidence of prior crimes is permitted only under limited circumstances. Id. at 255. The court held that a jury instruction could not cure the prejudicial effect, because the State's case depended almost entirely on that witnesses' testimony, and evidence of Escalona's prior conviction was logically relevant to the charged offense. Id. at 255-56.

Flores-Solorio is correct that the irregularity here was fairly serious. He was not charged with abuse of his daughter. The comments could have been understood to imply that Flores-Solorio had sexually abused a sixth victim, his own daughter. It was not cumulative of other evidence. And, the evidence came in

16

despite the fact that the trial court ruled that it would not permit evidence regarding the alleged abuse of C.F.

But, the statements here were capable of being cured by a jury instruction. The statements were vague. They required the jury to speculate and to infer that Flores-Solorio sexually abused C.F. in the same way that he abused P.R.Y., S.R.Y., and H.R.R. McMillian testified that after another officer arrested Flores-Solorio for child abuse, they were also worried about his daughter. This statement did not reveal that officers had any specific reason to suspect that Flores-Solorio had abused his daughter. P.R.Y., in testifying that C.F. asked her "why don't you let yourself--," did not mention that C.F. let Flores-Solorio abuse her. This statement referred only to Flores-Solorio's abuse of P.R.Y., not his alleged abuse of C.F. Even the most harmful statement, E.G.'s testimony that P.R.Y. told her that Flores-Solorio had something to do with C.F., is vague. The jury could infer that, because E.G. made this reference when discussing the abuse she experienced, E.G. meant that Flores-Solorio was doing something sexual to C.F. But, E.G. provided no details about what this was. And, E.G. did not speak about her personal knowledge of this abuse. Instead, she spoke to what P.R.Y. told her.[6]

---

[6] The vagueness of these statements becomes even clearer when they are compared to the evidence the State wished to present. Before trial, the State sought to introduce ER 404(b) evidence about Flores-Solorio's alleged abuse of C.F. It would have had P.R.Y. and S.R.Y. testify to the fact that they witnessed Flores-Solorio touching and raping C.F. The twins would have also testified that Flores-Solorio threatened to hurt C.F. if they told anyone about the abuse. However, the trial court excluded that evidence. Despite the isolated statements implying that Flores-Solorio abused C.F., the jury did not hear these specific allegations.

The ambiguity of these statements distinguishes this case from Escalona and Babcock. In Escalona, the trial court excluded evidence mentioning Escalona's previous conviction for assault with a knife, yet the jury still heard evidence of that conviction. 49 Wn. App. at 252-53. And, the lack of detail here distinguishes this case from Babcock. In that case, the jury heard extensive hearsay testimony from five witnesses concerning A.T. Babcock, 145 Wn. App. at 161-62. The charges pertaining to A.T. were dismissed after the jury heard these detailed accounts. Id. at 162. The mere suggestion that Flores-Solorio sexually abused another victim, without any specific information, does not rise to the level of the irregularities in Escalona or Babcock.

The wealth of evidence against Flores-Solorio further distinguishes the case from Escalona and Babcock. In Babcock, the State's entire case rested on the credibility of M.B. 145 Wn. App. at 164. Her testimony was inconsistent at times. Id. Given the dearth of corroborating evidence, testimony regarding similar acts of abuse perpetrated against A.T. was extremely prejudicial and inherently difficult for the jury to disregard. Id. at 164-65. And, in Escalona, the State's key witness was the one who revealed that the defendant had committed a similar crime. 49 Wn. App. at 253, 255. The State's case depended on that witness's testimony. Id. at 255. In such a close case, it would be extremely difficult for a jury to disregard logically relevant evidence. Escalona, 49 Wn. App. at 255-56.

This was not a close case. The State had a vast amount of evidence against Flores-Solorio. The three victims of the charged crimes testified before the jury. They explained what Flores-Solorio did to them in great detail. Two victims of

18

uncharged crimes also testified before the jury about times that Flores-Solorio touched them inappropriately. And, the jury heard from the investigating officers and a doctor who examined one of the victims.

The trial court was in the best position to determine whether a jury instruction could cure the irregularity here. State v. Weber, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). The court gave a curative instruction. It explicitly told the jury that it was not to consider any of E.G.'s testimony about what P.R.Y. and S.R.Y. told her during their conversation.

We hold that the trial court did not abuse its discretion in concluding that a jury instruction was sufficient.

IV.    Right to Compulsory Process

Flores-Solorio argues that his right to compulsory process under the Sixth Amendment of the United States Constitution and Article I, Section 22 of the Washington Constitution was violated. This argument traces back to Flores-Solorio's wanting two witnesses with no legal status to enter the United States to personally appear to testify on his behalf. He contends that the State violated his rights by failing to file a request for a significant public benefit parole. He also alleges that the trial court violated his rights by refusing to continue the trial so that he could bring his out-of-country witnesses to the United States.

The Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor." Article I, section 22 of the Washington Constitution

similarly protects this right. But, the compulsory process right is not absolute. State v. McCabe, 161 Wn. App. 781, 787, 251 P.3d 264 (2011). For the right to be violated, "[t]he contested act or omission must be attributable to the sovereign, and it must cause the loss or erosion of material testimony which is favorable to the accused." United States v. Theresius Filippi, 918 F.2d 244, 247 (1st Cir. 1990). The right is also subject to procedural and evidentiary rules. McCabe, 161 Wn. App. at 788.

Flores-Solorio contends that Theresius Filippi should control. In that case, the events leading to Filippi's arrest transpired in Quito, Ecuador. Theresius Filippi, 918 F.2d at 245. Filippi contended that an Ecuadorian citizen could corroborate his testimony. Id. Filippi's attorney sent two letters to the United States Attorney prosecuting the case to ask for assistance procuring a visa for the witness. Id. The United States Attorney never replied. Id. Defense counsel requested parole for the witness from the Immigration and Naturalization Service, but was told that the United States Attorney must request a public interest parole. Id. at 246. Finally, the trial court ordered the United States Attorney to request the parole. Id. The United States Attorney still refused, filing a motion for reconsideration. Id. After this long process, Filippi agreed to proceed to trial without the witness. Id. On appeal, the First Circuit determined that the United States Attorney violated Filippi's Sixth Amendment right to compulsory process by deliberately failing to take action when it was required to do so. Id. at 247. But, Filippi had waived the right by proceeding to trial. Id. at 248.

20

Although Flores-Solorio asserts that this case mirrors <u>Theresius Filippi</u>, the facts are distinguishable. Here, the State did act. It responded to defense counsel's request. It contacted the Department of Justice (DOJ) to ask if there is any process to bring defense witnesses from Mexico to the United States to testify. The DOJ provided resources regarding Mutual Legal Assistance Treaties and the S-visa program and informed the prosecutor that there is no process for bringing defense witnesses into the United States. The State forwarded this information— including the DOJ's recommendation that defense counsel contact the Office of Enforcement Operations—to defense counsel. This effort to assist Flores-Solorio cannot be said to be a deliberate failure to perform a required task.

Flores-Solorio further asserts that the trial court violated his compulsory right by refusing to continue the trial date for him to procure out-of-country witnesses. Flores-Solorio claims that he had no choice but to proceed without those witnesses, because the trial court had already made clear it would reject another request to continue on that basis. But, Flores-Solorio did not request another continuance. He offers no support for his argument that the trial court violated his right to compulsory process by refusing to grant a continuance that Flores-Solorio did not request.

We conclude that neither the State nor the trial court violated Flores-Solorio's compulsory process right.

V.    Ineffective Assistance of Counsel

Flores-Solorio contends that he received ineffective assistance of counsel, because his attorney did not move to compel the State to request parole for his out-of-country witnesses.

An ineffective assistance of counsel claim has two prongs. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). The defendant must show that counsel's performance was deficient, meaning it fell below an objective standard of reasonableness. Id. And, the deficient performance must have prejudiced the defendant. Id. For this to be the case, there must be a reasonable probability that the outcome of the case would have been different but for counsel's errors. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Counsel's performance is presumed effective. Id.

Flores-Solorio claims that his attorney's performance was deficient because there was no tactical reason not to file a motion compelling the State to request a significant public benefit parole for the witnesses. He further asserts that, because of the holding in Theresius Filippi, the trial court would have likely granted the motion. But, Flores-Solorio has not shown why the court would have granted his motion—or that, even if the State had requested a parole for the witnesses, such a parole would have been granted. Though Flores-Solorio asserts that his witnesses could have obtained a parole to testify on his behalf, the very materials he relies upon for this assertion reveal the narrow scope of that parole. U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, TOOL KIT FOR PROSECUTORS, at 24-26 (April 2011), http://www.ice.gov/doclib/about/offices/osltc/pdf/tool-kit-for-

prosecutors.pdf. The secretary of homeland security may grant a special interest parole to an alien who will be a witness in a proceeding. 8 CFR § 212.5(b)(4). Such a parole is "justified only on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit.'" 8 CFR § 212.5(b). Thus, this option is extremely limited, and Flores-Solorio has not shown that this case falls within the rule's narrow confines. Defense counsel could have recognized the narrow application of the rule and decided to explore other avenues to present this evidence.

Further, even assuming counsel's performance was deficient, Flores-Solorio has not shown that it was prejudicial. After learning that the State had found no method to parole Sanchez and C.F. into the United States, defense counsel moved to present their testimony telephonically. The trial court granted this motion, and Sanchez testified at trial by telephone. And, Flores-Solorio did not present C.F. as a witness. Although Flores-Solorio contends this decision would have likely been different had C.F. been available to testify in person, he offers no reason why she could not have testified by telephone.

Moreover, Flores-Solorio has not shown that the verdict would have been different if both Sanchez and C.F. had testified in person. Flores-Solorio presented live testimony suggesting that he was never alone with the victims and could not have had an opportunity to abuse them. H.R.R.'s sister testified she could not remember being away from H.R.R. for more than a few minutes while at Flores-Solorio's home. And, both P.R.Y. and S.R.Y.'s brother and mother testified that Flores-Solorio always took all the children with him on outings. There is no reason

to believe that additional live testimony from two witnesses with potential familial bias—Flores-Solorio's partner and his daughter—claiming the same things would have persuaded the jury to discredit the victims' testimony.

We hold that Flores-Solorio has not demonstrated ineffective assistance of counsel.

We affirm.

Appelwick, J.

WE CONCUR:

Cox, J.